SOUTH PENN OIL CO. v. CALF CREEK OIL & GAS CO. et al.

(Circuit Court, N. D. West Virginia.   August 22, 1905.)

No. 580.

1. EQUITY   JURISDICTION—MULTIPLICITY   OF   SUITS—ADEQUACY   OF   LEGAL REMEDY.

Where two actions at law were pending against the same defendant to recover damages for the taking of oil from a tract of land—one action by the owner of the land, and the other by a lessee under an oil and gas

lease—and the rignts of the respective plaintiffs in the oil as between themselves are uncertain under the lease, the facts are complicated, and the defense to both actions consists in part of an estoppel by acts in pais, equity has jurisdiction of a suit by the defendant therein against both plaintiffs to determine the entire controversy, both on the ground of avoiding a multiplicity of suits and because estoppels constitute a part of the substantive law of property and contracts, which it is peculiarly the province of equity to administer.

[Ed. Note.—For cases in point, see vol. 19, Cent. Dig. Equity, §§ 167–171.]

**2. COURTS—FEDERAL COURTS—JURISDICTION—ANCILLARY SUIT.**

A suit in equity in a federal court to enjoin the further prosecution of actions pending in said court, of which it has jurisdiction by reason of diversity of citizenship of the parties, and to enable the complainant to make his defense to such actions, is ancillary thereto and within the jurisdiction of the court, without regard to the citizenship of parties joined as defendants.

[Ed. Note.—For cases in point, see vol. 13, Cent. Dig. Courts, § 801.]

**3. EQUITY PLEADING—MULTIFARIOUSNESS OF BILL.**

A bill to enjoin the further prosecution of two actions at law against the complainant, which involve the same indivisible subject-matter, is not multifarious because the claims of the two plaintiffs in said actions are separate and distinct.

[Ed. Note.—For cases in point, see vol. 19, Cent. Dig. Equity, § 368.]

**4. RAILROADS—GRANT OF RIGHT OF WAY—CONSTRUCTION.**

A contract made by a landowner granting to a railroad company "the full and free right of way of the width of 50 feet" through his land, and covenanting to execute a deed, when required, conveying the land in fee simple, *held* to vest the company with the right of easement only.

[Ed. Note.—For cases in point, see vol. 41, Cent. Dig. Railroads, §§ 163, 164.]

**5. MINERALS—OIL AND GAS LEASE—SUFFICIENCY OF DESCRIPTION OF LAND.**

The owner of a tract of land comprising 60 acres executed a lease granting the oil and gas under the land "bounded and described as follows, to wit: North by lands of Ohio river, east by lands of Mrs. T. P. Pollock, south by lands of W. M. Irwin, west by lands of Mrs. J. C. Sharp, containing 30 acres," and also giving the lessee the refusal of the lessor's 30 acres reserved, which right of option, however, the lessee never exercised. *Held*, that the lease was void for uncertainty; it being impossible to determine from the description therein what part of the tract was intended.

**6. JUDGMENT—ESTOPPEL—RIGHTS ADMITTED BY CONSENT DECREE.**

A decree entered by consent, which fully recognized the right of an oil company to hold and operate upon a tract of land of which it was then in possession under a lease, estops the parties thereto from thereafter maintaining an action against such company or its successor in interest for trespass, based on the alleged invalidity of the lease.

**7. ESTOPPEL—ACTS IN PAIS—ACQUIESCENCE IN ASSERTED RIGHTS.**

Complainant and its predecessors in interest entered and drilled oil wells upon a railroad right of way under a lease from a railroad company. The owner of the land from which the right of way was taken and his lessee of the oil and gas therein, with full knowledge of such operations, made no objection thereto, but in various ways recognized the validity of the lease from the railroad company and the right of the lessee to operate thereunder. *Held*, that they were thereby estopped from maintaining actions against complainant to recover the value of the oil taken from the land, after complainant and its predecessors had expended large sums in developing the property.

## In Equity.

On November 23, 1900, the Calf Creek Oil & Gas Company, a West Virginia corporation, instituted on the law side of this court its action of case against the South Penn Oil Company, a Pennsylvania corporation, to recover $20,000 damages alleged to have accrued by reason of the plaintiff having been the owner of all oil and gas in and under a tract of 60 acres of land situate in Pleasants county, W. Va., and of the defendant entering thereon unlawfully and operating and boring wells and removing oil and gas therefrom. On the following day John B. Finley, as administrator of William Irwin, deceased, instituted a like suit on, the law side of this court against said South Penn Oil Company for $5,000 damages, alleging his decedent to have been the owner of said same 60 acres of land, and that the defendant company had entered upon, operated and bored wells, and removed oil and gas therefrom. On the 28th day of October, 1901, the said South Penn Oil Company instituted this suit in equity against said Calf Creek Oil & Gas Company, John B. Finley, administrator, and numerous others, seeking to enjoin and restrain the said Calf Creek Oil & Gas Company and John B. Finley, administrator, from maintaining and prosecuting said actions at law and to establish its right to operate for and remove from a certain portion of said 60 acres of land oil and gas. An amended and supplemental bill and a bill of revivor were subsequently filed in the cause. From the pleadings and proofs the facts seem to be as follows:

On March 14, 1882, William Irwin entered into a contract with the Wheeling, Parkersburg & Charleston Railway Company, subsequently succeeded by and merged with the Ohio River Railroad Company, whereby he granted and conveyed "the full and free right of way of the width of 50 feet" through the 60 acres of land in controversy, and bound himself, when required by the company, to convey the same by deed in fee simple. This contract was acknowledged by Irwin April 6, 1883, and admitted to record April 25, 1883. On January 21, 1899, the Ohio River Railroad Company by contract granted to F. D. T. Bickley all the oil and gas in and under said 50-foot strip of right of way through the Irwin and other lands upon certain terms and conditions not material. This contract was acknowledged January 26, 1899, and recorded February 1, 1899. Bickley associated with himself in the matter M. J. Peters, George Morlang, H. M. Spence, and E. K. Davis, and these parties at once commenced to bore wells upon the right of way strip through the Irwin lands, and on May 18, 1899, had substantially completed two producing wells thereon, when by contract of that date, in consideration of $14,250, they sold all their leasehold rights acquired from said Ohio River Railroad Company, together with substantially all of their property used in said oil operations, to the plaintiff. This contract was acknowledged the day of its date, and was recorded May 24, 1899. The plaintiff company immediately thereafter took possession of said two completed wells, bored three others on said Irwin right of way, and removed therefrom large quantities of oil, paying royalty to the said railroad company. Meanwhile, on September 2, 1895, William Irwin by contract had demised and granted to Richard Huggins all the oil and gas under a tract of land described in said contract as follows: "Situated in the district of Grant, county of Pleasants, state of West Virginia, and is bounded and described as follows, to wit: North by lands of Ohio river, east by lands of Mrs. T. P. Pollock, south by lands of W. M. Irwin, west by lands of Mrs. J. C. Sharp, containing 30 acres." This contract further provided: "The lessee to have the refusal of the lessor's 30 acres that he has reserved on the same terms and conditions of this lease." But, so far as appears, no contract of any kind was ever made showing that this refusal was accepted, or that said Huggins or his assignees had any interest in any other than the 30 acres. Huggins seems to have associated with himself, in this and other leases, J. P. Marshal and Clinton Pope; for, on November 26, 1895, these parties executed a power of attorney to said J. B. (alias Richard) Huggins, authorizing him to sell the leases on certain terms and conditions. This paper was acknowledged April 4, 1896, but not admitted to record until August 12, 1899. On April 14, 1896, Huggins, in his own right and as attorney in fact, conveyed this 30-acre lease and others to George W. Grimes. On April 21, 1896, Grimes sold the same

leases to the Calf Creek Oil Company, then a partnership, but now a corporation, reserving, however, an undivided sixteenth interest, which, by contract of date May 8, 1897, he sold to H. W. Hunter, ·trustee for David Levi, J. C. Roberts, T. L. Rogerson, M. F. Cox, George L. Darst, F. D. T. Bickley, J. C. Bardall, and H. W. Hunter. On June 10, 1899, the stockholders authorized and directed a sale of its holdings to be made to Henry Suhr & Co., and on August 22, 1899, this sale was consummated by its board of directors, and by it all the capital stock and all the interest of said company in the Irwin and other leases passed to and became vested in said firm, composed of Henry Suhr, C. M. Loomis, and F. D. T. Bickley.

It is fairly to be assumed from the pleadings and evidence that this sale of the Calf Creek Company to this firm was a result of a compromise of certain litigation growing out of these circumstances: The Calf Creek Oil & Gas Company was incorporated in May, 1896. Its capital stock consisted of 300 shares, of the par value of $200 each, of which 83⅔ shares were held by F. D. T. Bickley. Bickley was not only apparently the largest stockholder, but also a director, vice president, secretary, and the active manager of the concern. Eight wells had been drilled on the Irwin land, and others on other land. It seems, however, that prior to February 4, 1899, Bickley and the directors of the company had disagreed, and he had been removed as superintendent, but not as secretary, nor, so far as shown, as vice president. A man by name of Nixon had succeeded him as superintendent. Bickley regarded him as incompetent and negligent. The production of oil was decreasing, and the land owners were bitterly complaining, Irwin especially, because the conditions of his lease were not being carried out, because the wells drilling on the right of way strip (the royalty for which was going to the railroad company) would drain the oil from his land, and the Calf Creek Company was sinking no offset wells, and he and others were threatening to cancel their leases. Bickley on February 22, 1899, served notice on the directors of the condition of affairs, and asked them to remedy the evils in management. On February 4, 1899, the directors met, but were manifestly antagonistic to Bickley, refusing to carry out his suggestions, and removing him as secretary. Thereupon, on February 27, 1899, Bickley filed his suit in equity in this court, making said Calf Creek Company, its directors, Irwin, and other land owners parties, setting up these facts and others of a personal nature not material here, in which he prayed for the appointment of a receiver, with instruction to remedy the conduct of affairs of the company, to drill offset wells, and other things in accordance with his views. Irwin on March 2, 1899, filed a verified answer to this bill, substantially admitting its allegations, and joining in its prayer for relief. In it he says the Calf Creek Company had drilled on his 60 acres 8 wells, when by the terms of the lease he was entitled to 12; that production was rapidly falling off and gross mismanagement of the property was indulged. Such receiver was appointed by decree of this court, and on May 22, 1899, made a full report in answer to the instructions of the court. This report fully confirmed the charges and grievances set forth by Bickley in his bill, and in detail discusses remedies. After closing the body of his report, he adds this:

### "Special Report.

"Your receiver specially reports that, since the foregoing portion of his report was put into typewriting, the railroad right of way through the Irwin farm has been sold by M. J. Peters and others to the South Penn Oil Company, and your receiver is informed that the agents of said South Penn Oil Company have stated that they propose to locate three additional wells on said right of way through the Irwin; that already there are two producing wells on said right of way through the Irwin, as shown on the map (Exhibit No. 2), designated Nos. 1 and 2, and that it will be necessary, in order to protect said property, to put down counter wells on both sides of the railroad right of way, should said South Penn Oil Company make the development threatened. Your receiver further states that said Irwin, as shown on said map, is crossed by the said right of way from one side to the other; that this right of way is 50 feet in width, and passes through a very rich portion of the oil-producing part of the said Irwin farm; that the wells on

said right of way are said to be producing an average of 130 barrels each per day. Your receiver further reports that well No. 1 on said right of way commenced producing about the 24th of March, and produced, as your receiver is informed, large quantities of oil for several days, and then seemed to fall away, but that the well is now, as your receiver is informed, producing large quantities of oil; that the second well, being No. 2, as your receiver is informed, shows to be as good as No. 1; that, in order to counteract the effect of said well No. 1, which was situated almost on the outside of the right of way, your receiver deemed it absolutely necessary, without waiting for the directions and orders of the court, to protect the lines of said Irwin farm, particularly as said Irwin was exceedingly angry and disappointed at the action of the company prior to the receivership, in not protecting him, and, for the purpose of protecting said Irwin, not only from No. 1 on said right of way, but from No. 7 on the Pollock, which is shown on said map, your receiver commenced the construction of a derrick, and put down a well on the river side of said right of way, which is designated on said map by a red circle, which well is at this time on top of the sand and shows to be a producer, and your receiver believes that it would be absolutely necessary to protect said property to immediately commence a second well on the river side of said right of way to counteract the effect of No. 2; that he has constructed a derrick and is now ready and will commence immediately to put down a well as shown on said map, at a point opposite said No. 2 on the right of way. So that your receiver here especially reports that he should be given authority to put down all necessary wells on both sides of the said right of way through the Irwin, so as to protect and save said property from drainage by wells of said South Penn Oil Company."

Based upon this report a decree was entered in the cause, from which no appeal was ever taken, but which was in fact consented to and confirmed by agreement of parties as herein after shown, under date of 22d day of May, 1899, among other things directing the receiver to "put down two wells on the south end of the Irwin, and at least three wells for the protection of said Irwin from drainage by the South Penn Oil Company on the right of way aforesaid," and, further, "if the South Penn Oil Company shall continue to put down wells along the right of way aforesaid," said receiver put down "sufficient number of wells to counteract the drainage resulting from the operations of said South Penn Oil Company." In this condition of things the parties on June 10, 1899, compromised their difficulties; the stockholders of the Calf Creek Company authorizing the sale of its capital stock and lease holdings to Henry Suhr & Co., and Bickley undertaking to secure the discharge of the receiver and a dismissal of his suit. To this end Irwin filed separately, and also jointly with others, requests that said suit be dismissed, under the arrangement and understanding that the decree above referred to, providing for counter wells, be fully carried out, and that in the final decree the court reserve right to reappoint receiver and put him in possession upon failure by the company to do so. Such final decree was entered by this court in said cause on July 25, 1899, and, as we have before stated, the directors of the Calf Creek Company on August 22, 1899, confirmed the sale of its stock and holdings to Henry Suhr & Co.

It is shown by the testimony of Spence in this case, and not contradicted, that Bickley, before taking the leases from the Ohio River Railroad Company in January, 1899, brought the proposition to Peters and himself, saying he could obtain such leases from the railroad company on its right of way, to take such leases and carry an interest therein for him; that they objected on the ground that they might not be able to use the land adjoining the right of way, but Bickley assured them they would have no difficulty, because he could procure from Irwin a paper granting them the right to use such land; that he and Peters, before dealing in the matter, went and saw Irwin to prove Bickley's statement. It is strenuously insisted Spence is an incompetent witness as to this transaction with Irwin; the latter being dead. It is also shown by his testimony and that of others, and by papers filed, that Irwin did give, under date of January 28, 1899, a written contract for right of way through his lands, for the purpose of hauling, laying lines, and other work, and stations which might be desired in oil operations, "on

lands abutting on said lands"; that Bickley assigned this contract under date of February 27, 1899, to Peters and Spence, who in turn, on May 22, 1899, assigned it to the South Penn Company; that Peters and Spence, with full knowledge on the part of Irwin, under this contract did haul and lay pipe lines over lands of Irwin to said right of way, where they, with full knowledge and without objection from Irwin, were drilling the two wells under Bickley's contract or lease from the railroad company; that Irwin and Conner, his tenant, received and receipted to Peters and Spence for $11 as payment for a location for tanks on Irwin's land and for all damages to wheat on location, "together with right of way and tanks hauled to place"; that these tanks were used by them for storing oil taken from the wells on right of way; that Irwin also receipted to said Peters and Spence for $4 "for straightening up boiler, hauling stone, hauling engine to No. 2 well, and hauling gas tank to landing"; that, when the South Penn Company purchased and took charge of operations on the right of way under their contract from Bickley, Irwin stopped them from hauling over his lands, insisting that the right conferred by his contract with Bickley for that purpose was a personal one, not assignable, and that to save trouble the South Penn Company compromised and paid him $20 for this right; that, when the receiver was operating the Calf Creek properties, one of his rigs was located too near the right of way to suit Peters and Spence, and that they paid him $35 expense of moving the same back some 75 feet. Henry Suhr & Co. filed an answer, setting up the sale of the Calf Creek Company's stock and lease holdings to them, denying that any right in consequence existed in said Calf Creek Company to institute, after such sale, suit at law against the plaintiff South Penn Company, and fully conceding the latter company's right to the oil taken from said right of way. Under these circumstances the plaintiff in its bill insists that the said Calf Creek Company and Irwin's administrator are fully and completely estopped from setting up any claim to the oil taken, or from in any manner interfering with their use and occupation of said right of way for oil operations.

In this connection the question may naturally arise, what ground exists to dispute the legal right of plaintiff to operate on said right of way under and by virtue of the contracts from Irwin to the railroad, the railroad to Bickley, and of Bickley to it? The answer depends upon the construction to be placed upon the contract between Irwin and the railroad company. If it confers a fee-simple estate upon the company for the 50-foot strip of land, then no question can arise as to the plaintiff's legal right to operate under said contracts aforesaid. If, on the other hand, said contract be construed to pass only a "right of way," an easement over said land, then no right vested in said railroad company to said oil and gas under such strip of land, and none could be granted by it. The doubt as to its construction springs from the fact that, while it grants only "the full and free right of way of the width of fifty feet" over the land, it closes with this clause: "The said William Irwin does also hereby covenant and agree to execute and acknowledge in due form of law, when required by said company, a deed conveying to said company in fee simple the said land hereinbefore described."

Peculiar complications have arisen in the courts touching this question. It appears that both the original company, the Wheeling, Parkersburg & Charleston Railway Company, and its successor, the Ohio River Railroad Company, in taking rights of way for the road, used a blank form containing these two clauses, and that many contracts of this character were taken. In 1887 A. L. Sehon, who had executed such contract, instituted his action of ejectment in circuit court of Mason county to recover said right of way. The company thereupon filed its bill to enjoin the prosecution of this action at law and to compel specific performance of the contract. The circuit court denied the relief prayed for and dismissed the bill. An appeal was taken to the Supreme Court of Appeals of the state, and that court on March 15, 1890, reversed the circuit court, upheld the contract, enjoined the prosecution of the suit at law, and directed specific performance of the contract and conveyance of the right of way strip in fee simple. Ohio River Ry. Co. v. Sehon, 33 W. Va. 559, 11 S. E. 18. Chas. D. Uhl, of Wood county, had executed one of these contracts, and the railroad company had executed a lease for oil on the right of way so derived to Logan, who started to erect derrick

thereon. Thereupon Uhl filed his bill in the circuit court of Wood county, insisting upon the restricted construction of said contract that it only vested an easement over the land in the company, and obtained an injunction against oil operation by Logan. A motion to dissolve this injunction was by the circuit court overruled, and thereupon an appeal was taken to the Supreme Court of Appeals of the state.    Uhl likewise filed his bill against said railroad company, and procured an injunction restraining it from interfering with his laying pipe lines across the right of way at his farm crossing thereof to his residence for the purpose of conveying thereto gas and oil. This injunction was dissolved, and Uhl appealed to the Supreme Court of Appeals of the state. That court on November 28, 1899, reversed the circuit court in this latter case, and held Uhl was entitled to lay pipe lines across the right of way to convey gas, but not oil, to his residence. In this case Dent, J., refers to the first case, and says that in it they had held that the right of way contract had vested in the railroad company the fee simple of said strip of land. Uhl v. Ohio River R. Co., 47 W. Va. 59, 34 S. E. 934. It seems the court did render such decision in the first case, but the opinion was never filed, doubtless because a petition for rehearing was filed in accordance with the rule of that court before the end of the term at which it was rendered, and it was withheld for further consideration. Meanwhile Jesse Pugh, of Wood county, having executed one of said contracts and his land having descended to A. N. Pugh, the latter on May 31, 1898, gave to Stephen Lockwood an oil lease contract on his land, who under it drilled wells and secured large quantities of oil. The railroad company on August 18, 1898, gave to Samuel Logan a lease on the right of way through the Pugh land. In November, 1898, Lockwood filed his bill in this court against Logan and the railroad company, insisting that the company only had an easement over the land, and praying an injunction against Logan's oil operations on the right of way strip and for the appointment of a receiver. Jackson, District Judge, refused him the relief sought, holding that the railroad company had the fee simple to this strip of land. An appeal was taken from his decision, and on July 9, 1900, the Circuit Court of Appeals for this circuit reversed this court, and held that the railroad company only took an easement in the land. Lockwood v. Ohio River R. Co., 103 Fed. 243, 43 C. C. A. 202. In this case a certiorari was refused by the Supreme Court on January 14, 1901. 180 U. S. 637, 21 Sup. Ct. 920, 45 L. Ed. 710. On March 8, 1902, the first case of Uhl against the railroad company, doubtless after rehearing, was decided by the state Supreme Court of Appeals, reversing their first holding, and deciding, in harmony with the federal courts, that the contract only vested' an easement in the railroad company over the land. 51 W. Va. 106, 41 S. E. 340.

A. B. Fleming, R. F. Fleming, W. N. Miller, T. P. Jacobs, and U. N. Arnett, for plaintiff.

Wm. Beard, for defendant Calf Creek Oil Co.

V. B. Archer and Wm. Beard, for defendant Irwin's administrator.

Wm. J. Breene, for defendants Bickley, Suhr, and Loomis.

J. W. Vandervort, for defendant Ohio River R. Co.

DAYTON, District Judge (after stating the facts as above). The demurrer in this case, I think, was very properly overruled by my predecessor, and, although defendants in their answer and arguments have earnestly insisted that this suit ought not to be maintained, because plaintiff can make full defense to the actions at law, I do not agree with them. The defense of the actions at law involves all the elements of estoppel in pais by the acts, conduct, and writings of the parties; it also involves a consideration of the question of how far defendants may be barred by a judicial proceeding; and, further, it might involve a determination

from the involved state of facts of the particular rights to recover, if any such they have, between the two principal defendants, the Calf Creek Company and Irwin's administrator. The one, not being party to the other's action, would not be bound by the jury's verdict in the other's case. Thus the plaintiff, who is defendant in those actions, might run great risk, if held liable at all, to have a double liability created, which would cause it extraordinary trouble and expense, more than probably by a final resort to equity, to avoid. The avoidance of a multiplicity of suits is involved, as well as the defense of estoppel, here, and equity, it seems to me, is required to intervene to do full and exact justice according to its principles and those of good conscience. While estoppel may be set up as a defense at law, especially to the action of ejectment, as held in Kirk v. Hamilton, 102 U. S. 68, 26 L. Ed. 79, and Dickerson v. Colgrove, 100 U. S. 578, 25 L. Ed. 618, yet it is to be borne in mind that the doctrine of estoppel by acts and conduct of parties is a creation of equity alone, and the very great weight of authority is to the effect that generally equity alone should administer it. This is peculiarly so where the circumstances out of which such estoppel is claimed to arise are complicated and involved in transactions between different parties.

An examination of the facts of the two cases cited show them to have been simple and the remedy easily applied. In those cases legal titles only could be relied on. Here executory contracts alone are involved. It is not the simple question of whether a party having a full legal title by deeds has by an act of his estopped himself, but the very question of recovery in these actions at law here must necessarily be determined by the construction and effects of a number of contracts purely executory, standing alone, and in their relation to and effects upon each other. For instance, if it should be held that the oil lease contract of Irwin to Huggins conveyed all the oil and gas underlying Irwin's 60 acres of land, then how possibly could Irwin's administrator maintain his suit at law against the South Penn Company for any part of this oil? If it should be, on the other hand, held that the Calf Creek Company sold and conveyed all of its stock, franchises, and holdings to Suhr & Co. before its suit was brought, how could it maintain it? On the other hand, if it be held that the Irwin-Huggins contract is void for uncertainty of description, and therefore granted nothing to Huggins and his assignees, how could the South Penn Company be held to account to any one but Irwin's administrator, and how to him, in case his decedent, by his acts, declarations, conduct, and contract, acquiesced in their taking the oil and estopped himself from denying their right to do so? The simple fact that all these questions may arise, and had to be considered by the South Penn Company in preparing its defense to these actions, fully convinces me that they could well assume that such defense could not adequately be made at law.

Another consideration has had great weight in my mind in this holding. While Greenleaf (Ev. § 22) and Stephens (Dig. Ev. §§ 102–105) treat estoppel as a branch of the law of evidence, the

later and better authorities hold that, inasmuch as they constitute good defenses or good grounds of title, as the case may be, and frequently operate to transfer or bar title with the same full effect that a conveyance or a statutory adverse possession would have, they should be held to be means of determining primary rights of property, and not the mode or means by which such rights are proved. Stoddard v. Chambers, 2 How. 284, 11 L. Ed. 269; 2 Pom. Eq. Jur. § 801. This being true, and estoppel, therefore, constituting a part of the substantive law of property and contracts, it seems to me to be peculiarly the duty of federal courts to follow the decisions of the courts of their states in both their construction and method of application. If this be true, there can be no question about the matter. The Supreme Court of Appeals of West Virginia, in Hanly v. Watterson, 39 W. Va. 214, 19 S. E. 536, and in Norfolk & Western R. Co. v. Perdue, 40 W. Va. 442, 21 S. E. 755, has distinctly held that estoppel by conduct of party, commonly called "estoppel in pais," is an equitable defense, to be enforced in equity. The same court has held, in Bias v. Vickers, 27 W. Va. 456, that, where a party has an equitable defense made by express statute available at law, he is not deprived of his right of setting up such defense in equity, but may have his choice of so doing or availing himself of it at law under the statute. There can be no doubt of this court's jurisdiction to maintain this suit. The actions at law were properly instituted in this court by reason of diversity of citizenship. This suit is brought as ancillary thereto, and by reason thereof to aid the defendant therein to make its defense. It is immaterial under such circumstances that some of the parties connected with the transactions, who have been made parties, may be citizens of the same state as plaintiff.

The defendants insist that the bill is multifarious, because the two actions at law, involving the one the claim of the Calf Creek Company and the other that of Finley's administrator, are sought to be enjoined in one and the same suit, insisting that their rights are wholly separate and distinct. I do not believe this contention to be well founded. While the actions at law are distinct, they both relate to one and the same subject-matter, to wit, the oil taken by the South Penn Oil Company from the land of Wm. Irwin. It clearly appears, too, that it is not a divisible subject-matter. If Huggins' lease, made long before any oil was produced by any one from the land, granted to him all the oil under this 60 acres, as claimed (and it appears by the record that his assignees exercised the right without objection from anybody to bore wells and take the oil from all parts of the farm, except from the right of way strip), then, as I have intimated, Irwin's administrator can have no claim whatever against the plaintiff. If those holding under Huggins allowed another to take away a part of their oil, it was no concern of Irwin. He could under his contract recover his royalty alone from them. If, on the other hand, his lease is void, then the Calf Creek Company, holding under it, has no cause of action; for in the law declarations there are no allegations of an assignment or apportionment agreed and made between them

of the claim for damages against plaintiff for the oil taken. It is always to be remembered that the determination of the question of whether a bill is multifarious is one largely within the sound discretion of the court, and dependent to a very considerable degree upon the particular facts of each case. United States v. American Bell Telephone Co., 128 U. S. 315, 9 Sup. Ct. 90, 32 L. Ed. 450; Walker v. Powers, 104 U. S. 245, 26 L. Ed. 729; Brown v. Guarantee Trust Co., 128 U. S. 403, 9 Sup. Ct. 127, 32 L. Ed. 468; Oliver v. Piatt, 3 How. 333, 11 L. Ed. 622; Arnold v. Arnold, 11 W. Va. 455; Shafer v. O'Brien, 31 W. Va. 601, 8 S. E. 298; Segar v. Parrish, 20 Grat. 672.

This brings us to the merits of the controversy. There can be no longer question that the contract from Irwin to the Ohio River Railroad Company did not confer a fee simple, but only an easement in and to the 50-foot strip of right of way, and in consequence that the railroad company's lease to Bickley conferred upon him or his assignees no legal right to operate for and take away oil and gas therefrom. I think it is just as clear, though not so well settled judicially, that, standing alone upon its own terms, the lease from Irwin to Huggins is void for uncertainty in its description, and therefore conferred upon him and his assignees no legal right to the oil and gas in and under the 60 acres, or any part thereof. The test of an instrument's sufficiency in description is whether specific performance can be made according to the very terms of the deed or contract. Let us examine this contract a moment. Properly construed, it undertakes to convey all the oil and gas underlying 30 acres of the 60-acre tract, to be bounded on the north by lands of the Ohio river, east by lands of Mrs. T. P. Pollock, south by lands of W. M. Irwin, and west by lands of Mrs. J. C. Sharp. These words of description might well describe the whole tract, and, if the oil under the whole tract was being granted, might well be held sufficient; but we are to remember that 30 acres out of the 60 are to be carved out and identified by these words of description. In how many different forms could this 30 acres be surveyed out that would reasonably conform to these words of description, and which one would a court have the right to choose as the one meant by the contract? I am aware that the courts deal leniently with this matter of descriptive boundaries; but in a case of this kind, where the inclusion in the boundary of one acre covering the right of way strip, for example, may be worth much more than another acre included by a different survey, there must be some intimation of where the division lines are to fall. The clause in the contract giving the "refusal" of the oil under the other 30 acres does not help things, for only that under 30 acres was in fact granted. The books are full of cases where courts of equity have refused to specifically enforce contracts of sale of lands, because the terms of description are too indefinite. I need only cite such cases from our state reports as Crim v. England, 46 W. Va. 485, 33 S. E. 310, 76 Am. St. Rep. 826; Westfall v. Cottrills, 24 W. Va. 763; Mathews v. Jarrett, 20 W. Va. 415; Gallagher v. Gallagher, 31 W. Va. 9, 5 S. E. 297.

If this position be rightly taken, then the Calf Creek Company, like the South Penn Company, must be driven to rely upon an equitable estoppel as against Irwin's administrator, should he determine to sue for the oil taken from the 60 acres by it; and it certainly has no right of action against the plaintiff for damages as alleged in its declaration in the law cause under such circumstances. But, whether this position be tenable or not, I have no trouble in reaching the conclusion that the Calf Creek Company cannot maintain its action at law for several other reasons:

First. Because the pleadings and decrees in the case of Bickley against it fully recognized the South Penn Company's right to operate upon and take the oil from the right of way. Unlike Lockwood in his case against Logan, no injunction was asked, no denial was made by the Calf Creek Company, but the decree recognizing this right was wholly acceded to. In Corrothers v. Sargent, 20 W. Va. 351, at page 356, Snyder, J., says:

"It is well settled that a point once adjudicated by a court of competent jurisdiction, however erroneous that adjudication, may be relied on as an estoppel in any subsequent collateral suit in the same or any other court, at law or in chancery, when either party or the privies of either party allege anything inconsistent with it; and this, too, when the subsequent suit is upon the same or a different cause of action. Nor is it necessary that precisely the same parties were plaintiffs or defendants in the two suits."

In Beckwith v. Thompson, 18 W. Va. 103, it is held:

"A fact necessarily involved in an issue on which there has been a judgment is thereby exclusively settled in any suit thereafter between the same parties and their privies."

In Tracey v. Shumate, 22 W. Va. 474, it is held:

"A final decree in a chancery cause is as conclusive as a judgment at law; and it is conclusive on the parties and their privies of every fact which the final decree necessarily affirmed the existence of, whenever the existence of such facts are again put in issue."

Perhaps no court in the United States has gone farther towards maintaining this doctrine of legal estoppel than has the Supreme Court of Appeals of this state, as shown by such cases as, Western M. & M. Co. v. Va. C. C. Co., 10 W. Va. 250; Corrothers v. Sargent, 20 W. Va. 351; Mason v. Bridge Co., 20 W. Va. 223; Wandling v. Straw, 25 W. Va. 692; McCoy v. McCoy, 29 W. Va. 794, 2 S. E. 809; Seabright v. Seabright, 33 W. Va. 152, 10 S. E. 265; Parsons v. Riley, 33 W. Va. 464, 10 S. E. 806; Sayre's Adm'r v. Harpold, 33 W. Va. 553, 11 S. E. 16; Lawson v. Conaway, 37 W. Va. 159, 16 S. E. 564, 18 L. R. A. 627, 38 Am. St. Rep. 17.

What is clearer than that in this Bickley suit it was determined that the South Penn Company had bought the lease from Peters and Spence, was going to drill additional wells, and had right to do so, and, in order to carry out the obligations of the Calf Creek Company, counter wells must be sunk? The Calf Creek Company was a party, conceded all this, and certainly is now estopped from denying it. Nor can this conclusion be avoided on the ground that the South Penn Oil Company was not a party to the suit, not bound by its decrees, and the facts recognized and adjudicated were not,

therefore, adjudicated between the same parties or their privies in interest, for the plain and indisputable reason that Bickley, the Calf Creek Company, and Irwin were parties. Bickley had taken the lease from the railroad company, had taken Peters and Spence in partnership with him, and had instituted the suit, and during its pendency the South Penn Company had become a purchaser of the interests of this partnership, with Bickley as a member of it. It is not necessary to cite authority to show that a pendente lite purchaser is not required to be made, by amendment, a party, in order to be bound by the findings of facts or the judgments or decrees in a cause; for that point has been too long and too well settled to admit of contradiction.

Second. Because I regard it as grossly inequitable to say that this Calf Creek Company could allow its vice president, secretary, and manager, Bickley, to go to the railroad company and take this contract, assign it to Peters and Spence, retaining an interest, however, allow them to expend large sums in boring for oil, obtain it, allow them to assign to plaintiff, permit it to expend other large sums in drilling other wells, take away the oil, pay royalty to the railroad without a word of dissent, and then come in and recover the value of the oil taken.

Third. I am fully convinced that a fair construction of the resolutions of its directors confirming its sale to Henry Suhr & Co passed to that firm all of its rights and interests in these matters—in fact its stock and franchises—before its suit at law was brought, and that, therefore, its institution was unwarranted.

And touching the action brought by Irwin's administrator I also have no trouble in reaching the conclusion that it cannot be maintained for these reasons:

First. He did not, like Uhl, deny that his contract gave the railroad the fee simple to the right of way. On the contrary, he declared it did so. If he was ignorant of what he had done and the extent of his own contractual act, he certainly could not, nor can his administrator, be allowed to plead such ignorance in his own behalf to the prejudice of innocent parties who acted upon his own declarations as to what he had done. He not only allowed Spence and Peters, and their assignee, the plaintiff, to enter, but also by contracts for valuable considerations suffered them to haul and lay pipe lines over his other land in order to enter upon the right of way. He aided them in commencing operations. He permitted them, for a money consideration, to build a tank on his land to store the oil. He suffered the oil to be taken away.

Second. He, too, was a party to the Bickley suit, filed his own sworn answer therein, and asked relief therein of counter wells against the plaintiff's wells on the right of way. He was bound by the decrees therein.

Counsel for both parties with commendable zeal and industry have discussed in elaborate detail all the elements of equitable estoppel, and have cited a very great number of cases in illustration and support of their respective views. I have examined carefully these authorities, but deem it unnecessary to discuss them

here. As I have hereinbefore said, estoppels are a part of the substantive law of property and of contracts, and therefore the obligation of this court to follow the decisions of the courts of this state touching their construction and operation is plain; and I think the principles laid down in Hanly v. Watterson, 39 W. Va. 214, 19 S. E. 536, and Norfolk & W. R. Co. v. Perdue, 40 W. Va. 442, 21 S. E. 755, not only justify but require, me to hold that Irwin by his acts estopped himself from denying plaintiff's right to operate for and appropriate the oil from the railroad right of way through his land.

Let decree be entered granting to the plaintiff the relief prayed for.