# Wytheville

## W. C. DEFORD AND J. W. TAYLOR, JR., EXECUTORS OF J. WILEY HALSTEAD, DECEASED, ET ALS. V. BALLENTINE REALTY CORPORATION.

June 13, 1935.

Present, Campbell, C. J., and Holt, Hudgins, Gregory, Chinn and Eggleston, JJ.

The opinion states the case.

*Alfred Anderson* and *Mann & Tyler,* for the appellants.

*Savage & Lawrence,* for the appellee.

HUDGINS, J., delivered the opinion of the court.

The complainant, Ballentine Realty Corporation, filed a bill against the executors, trustees and beneficiaries under the will of J. Wiley Halstead, deceased, praying that the contract of sale to the corporation of 381 lots, known as the Willoughby Bay lots, in the city of Norfolk, be rescinded, and the deed from J. Wiley Halstead to the corporation, bearing date on the 10th day of December, 1923, be set aside and declared null and void, and that the respondents be compelled to pay complainant the sum of $49,530, purchase price, with interest from date of sale.

The answer alleged that the sale of the Willoughby lots was only a part of the contract between Halstead and the corporation, which included the sale of both the Willoughby lots and some forty-four acres of land known as the Fox Hall farm. The chancellor held that the sale of the lots and the acreage constituted one transaction, and that the corporation was entitled to a rescission of the sale and a return of the purchase price, but that it would have to account for the profits, if any, made out of the development, buildings and sales of the Fox Hall tract. To ascertain the exact amount of such profits or losses, the cause was referred to a commissioner to take accounts. From that decree, the respondents sought and obtained this appeal.

The first assignment of error is to the finding of the chancellor that in consummating the sale to the corporation, J. Wiley Halstead was guilty of a breach of duty which he owed to it.

There is very little conflict in the evidence. The difficulty arises in the inferences which the parties draw from the evidence and in the application of the law thereto. It is

conceded that at the time the contract was made, Halstead was president and general manager of the Ballentine Realty Corporation, and in that transaction he did not assume to act for the corporation but for himself, and dealt with the other directors, who were acting for the corporation and were personally disinterested.

A transaction between an officer of a corporation and the corporation is similar to one between a trustee and *cestui que trust*. In *Waddy* v. *Grimes,* 154 Va. 615, 647, 153 S. E. 807, 817, the majority rule is stated thus: "There is a distinction to be made between transactions occurring directly between a trustee and his *cestui que trust,* and those transactions in which the trustee deals with himself in respect to the trust estate. The latter class of transactions are voidable by the *cestui que trust* at his election without giving any reason or alleging any fraud, or any advantage or inadequacy of price. But where the trustee deals directly with the *cestui que trust,* the transaction is not *ipso facto* voidable at the election of the *cestui que trust;* but only *prima facie* presumed to be invalid, which presumption may be rebutted."

The evidence shows that in 1907 J. Wiley Halstead organized the Ballentine Realty Corporation for the purpose of acquiring, developing, subdividing and selling real property. Shortly after its organization, this corporation acquired a tract of land containing some 366 acres, situated in the eastern section of the city of Norfolk and known as the Ballentine farm. This acreage was plotted, subdivided into lots, streets and sidewalks were laid out and improved, buildings erected, and sale of the lots and buildings undertaken. This venture proved very successful.

By the latter part of 1921 or early in 1922, so much of the property had been sold that it was found inadvisable and unprofitable to maintain the large and expensive organization which the company then had. Mr. Halstead's salary, which had been five thousand dollars annually, was reduced to $2,500, and other curtailments followed. Mr. Halstead and the directors realized that it was necessary either

to dissolve the corporation and dispose of its assets, or to acquire more property for development.

Mr. Halstead, in 1917, had purchased from a substituted trustee at a forced sale, some lots in the city of Norfolk, near Ocean View, for which he paid $8,088.75. Subsequently, it was claimed that the substituted trustee had been appointed without due notice to all parties in interest, and that the title of Mr. Halstead to the lots in question was not good. In 1920, a receiver for the Jamestown Land Corporation, grantor in the deed of trust under which the substituted trustee had sold the lots, reoffered them for sale, and from him Mr. Halstead purchased 381 lots, the subject of this controversy, at the price of $15,240, receiving credit for the eight thousand and odd dollars he had previously paid to the substituted trustee.

On April 4, 1923, notice was given for a called meeting of the directors, in which notice it was stated that Mr. Halstead was offering to sell the lots to the corporation on certain conditions, the prices ranging from $125 to $150. The hour of the meeting was set for four, p. m., and at the bottom on the notice was this note: "The meeting was called by the president at the hour named in order to give each an opportunity to see and investigate the property before the meeting, and I will be glad to show it to you at any time." At this meeting on April 11th, the minutes showed that Mr. Halstead requested "that the members consider the proposition strictly from a business standpoint and not consider his individual interest." He modified his offer to convey the lots to the corporation for four hundred shares of preferred stock, and stated that if the stock was redeemed within the year he would make a reduction of ten per cent, in which case the lots would cost the corporation less than $100, each. "He then retired to give those present an opportunity to discuss the matter freely." After the discussion, one of the members had to leave and Mr. Halstead, called back into the meeting, stated that because of his personal interest he would not vote on the question. Some of the members expressed a desire to liquidate instead of ex-

panding, and some desired to purchase the lots. The meeting adjourned without any action being taken.

When the corporation declined, or rather, failed to accept his offer, Mr. Halstead offered to purchase the acreage and lots of the Ballentine property then unsold, and, with notice of a meeting called to consider his offer, furnished the directors with a statement of the acreage, the lots, and the cost price. Nine of the fifteen directors attended the meeting and adjourned for the purpose of viewing the properties. No definite action was taken, but a committee of three was appointed to confer with Mr. Halstead "in regard to the liquidation of the company, or to adopt some method by which the business would be continued," and to meet whenever the committee was ready to report. At a meeting of the directors held on June 2d, the committee made the following report:

"First—To continue the corporation. This would make it necessary to acquire additional land. If Mr. Halstead will renew his proposition with reference to the Willoughby property, we would recommend favorable action on one or the other plan for payment contained therein provided the purchase price of this property is considered by directors to be fair and reasonable. In addition, secure more property, if possible, as it is evident that the present overhead expense is far too great for the amount of business we are doing; and unless we can secure more land, we recommend,

"Second—That the corporation be liquidated; this to be done at the earliest possible date in a manner strictly according to law and safeguarding the interests of purchasers of Ballentine property, as they may appear. We are not suggesting any particular plan, not being familiar with the different phases and the legal points to be considered."

During this meeting, Mr. Halstead stated that it was not necessary to discuss his previous proposition to sell his 381 Willoughby Bay lots; that the offer was withdrawn. The directors passed a resolution that the corporation accept Mr. Halstead's offer to purchase its assets, and the meeting adjourned for further time to consider this proposition.

On June 8th, it was decided to reject Mr. Halstead's offer to purchase the property, and he thereupon tendered his resignation as president, to take effect immediately. The resignation was rejected and the meeting adjourned. A called meeting of the stockholders was held on July 13th for the purpose of determining whether to sell the assets of the corporation or to divide them among the stockholders. All the propositions offered by Mr. Halstead at this meeting were rejected, and the meeting adjourned to August 4, 1922. Again an offer made by Mr. Halstead to purchase the assets of the corporation was rejected.

While we have not the benefit of Mr. Halstead's testimony, as he died in the summer of 1931, the evidence discloses that he was a man of good business ability and that he had devoted his entire time from 1907 to 1922, a period of fifteen years, to the development of the properties owned by the Ballentine Realty Corporation, for which he had received a substantial salary. The fifteen men who composed the board of directors were some of the leading business and professional men of the city of Norfolk and vicinity, and their service on the board of directors of this corporation was merely incidental to their business or professional activities.

It was apparent that unless the directors decided to expand, Mr. Halstead would have very little business for the company to demand his attention. The corporation had declined to buy his lots and declined to sell him its properties. With this situation confronting him, he was looking around for other business openings and finally secured an option from J. H. Cofer to purchase the Fox Hall farm at $700 an acre. He had his attorney, in 1922 or 1923, draft a charter for another corporation, in which he expected to develop and sell the Fox Hall farm and the Willoughby lots, and was seeking other business associates to join him in this venture.

On January 11, 1923, there was a regular meeting of the stockholders. The old board of directors was reelected, and the minutes show that a Mr. J. C. Nelms, chairman of a

committee appointed at the August meeting to "confer with the president in regard to the future conduct of the company, reported that his committee (composed of himself, J. B. Dey and G. L. Vincent) had gone over the matter very carefully and that they had reached an agreement with Mr. Halstead that he would continue the affairs of the company as they had been conducted in the past, and it was his idea that on account of the recent annexation by the city of the outlying territory that our property should enhance in value to a very material extent." On the same day, the newly elected directors held a meeting, declared a dividend, and adjourned.

In the notice for a meeting of directors to be held on April 3, 1923, it was stated that the object of the meeting was to consider an offer made by Mr. Halstead to sell to the corporation an option to buy the Fox Hall farm at $700 an acre and the Willoughby lots for $130 a lot; "both properties to be taken together and will not be acceptable to the owner unless unanimously approved by the directors voting, as the owner is unwilling to sell it to this corporation if any of the directors are opposed." With this notice was the following letter, addressed to each director:

"I am giving you the above opportunity before I put the properties in a separate corporation for development and sale, and if you don't approve please be candid and frankly say so.

"The meeting is called at 4:00 P. M. to give any one an opportunity to see the property before the meeting.

"If I have to handle one of the properties in a separate corporation I prefer to handle both in the same way; therefore do not wish to separate at the price named.

"Yours very truly,

"J. W. HALSTEAD."

At this meeting Mr. Halstead's offer was accepted by the directors and he was paid for the lots $49,530, which included interest. Cofer was also paid the amount due him for the 44.22 acres. About the same time, Mr. Halstead purchased six hundred shares of preferred stock in the Bal-

lentine Realty Corporation for $51,000, the same price at which the stock was being sold to other parties. Immediately after the consummation of the sale, the corporation, with Mr. Halstead as president and general manager, began work on the development of the 44.22 acre tract, streets and sidewalks were laid out and improved, houses erected and numerous sales consummated.

No dividends were declared after 1929, and in August, 1931, as heretofore stated, Mr. Halstead died. At the first meeting after his death, the directors, most of whom had served on this board with him for many years, passed very eulogistic resolutions concerning him, from which we quote the following:

"To set forth in a resolution what we thought of Wiley Halstead would be like trying to walk with crutches. Mere words are poor vehicles to convey the deep feeling of friendship with which we regarded him.

"We wish, however, to attest our appreciation of his sterling worth and flawless character, both as a business associate and as a personal friend.

"Having founded the Ballentine Realty Corporation in 1907, we have been associated with him through some very trying and troublesome times, and testify to his unswerving loyalty to his trust, and his indomitable will which defied defeat.

"Verily he went forth to meet defeat with a smile, and gloried in a fight when he felt he championed a just cause.

"As a friend, he was kind, considerate and true to the point of self-denial.

"As a citizen, he was interested in the progress and upbuilding of Norfolk and did a splendid service along this line in building up Ballentine Place and Fox Hall.

"As directors of this company, we shall miss him sorely, the city of Norfolk will miss his wise counsel, and that vast number who knew his philanthropy and charity will miss him more.

"Surely, the world lost a real man when Wiley Halstead passed to his reward."

Approximately two years later, the men responsible for the above resolutions, again acting for the corporation, instituted this suit charging Mr. Halstead with committing a fraud upon them in the sale of the properties mentioned.

The basis of the charge is: (1) That Halstead dominated his co-directors; (2) that without consideration he transferred to J. C. Nelms, Jr., three shares of stock in the corporation, for the purpose of getting him to persuade Milton McKann, a director and secretary of the corporation, from disclosing to the other directors the price Halstead paid for the Willoughby lots; (3) that Halstead failed to disclose to the directors the cost of the Willoughby lots to him.

(1) The directors testified that they had full confidence in Halstead and left the management of the affairs of the company to his judgment. It is established by the minutes of the corporation, not written by Halstead, that when he offered to sell the corporation the real estate in question, or to buy the assets of the company, he informed the directors that he was acting for himself and not in the interest of the corporation; six of his various propositions were declined, and it was only when he offered to sell the Willoughby lots and his contract to buy the Fox Hall farm together that the directors agreed to purchase from him. This shows no undue domination of the directors in this transaction. The directors knew his ability to develop suburban property and were anxious to retain the use of that ability for the company.

(2) It is contended that J. C. Nelms, Jr., was made a stockholder for the purpose of inducing McKann not to inform the other directors what Halstead had paid for the Willoughby lots, and that Nelms, as a stockholder, endeavored to persuade the directors to purchase these lots from Halstead. The evidence shows that in the summer of 1922 Halstead discussed with Nelms, his friend, a rift which had occurred between him and McKann and asked Nelms to attend a meeting of stockholders and see if he could not heal this breach. Nelms replied that he owned no stock in the corporation and hence it would be out of place for

him to attend the meeting. Thereupon, Halstead, without consideration, transferred to Nelms three shares of his stock in the company. This stock was carried on the books of the company for several years in Nelms' name, but he never received any dividends thereon. Nelms attended the stockholders' meeting in August, 1922, and discussed with McKann the breach. At this meeting Nelms was appointed on a committee with Mr. Dey, the present president of the corporation, and Mr. Vincent, who is now dead, "to confer with the president and recommend some new plan for the future operation of the company, and to report to the board of directors at a meeting to be called by the president."

This committee did not report to the board of directors as requested, but it did make a report to the stockholders at their next annual meeting, held on January 11, 1923. As this report has heretofore been quoted in full, we will not repeat it here. So far as the record shows, this was the extent of Nelms' activity as a stockholder.

McKann testified that he knew what Halstead paid for the Willoughby lots and when Halstead told him he was going to offer them for sale to the corporation at $150 per lot, he said: "Don't you try to put anything like that over on the company;" that when Halstead first offered the lots to the company he told Vincent what Halstead had paid for them and Vincent said that it was ridiculous. McKann further testified that what he said to Vincent made Halstead angry, and in his opinion that was the only trouble that Nelms was trying to straighten out.

Nelms testified that he knew nothing about the corporation buying any property from Halstead, and that he made no recommendation concerning the purchase of that property or any other. In fact, he did not know that the corporation had purchased this property until some years later. In closing his testimony, he stated:

"I would like to say that this allegation that you allege in your bill about my being used to help Mr. Halstead to carry on some scheme that was not honest and just and right, is all very much in error.

"Q. If you were used, you were not conscious of being used; is that right?

"A. If I was used, I was not conscious of being used, and I do not believe I was used."

Mr. Dey, who was active in the prosecution of this suit, served with Nelms on the committee which conferred with Mr. Halstead. When called as a witness, he made no statement tending to show lack of good faith, or to cast any reflection upon either Halstead or Nelms in this matter. Both McKann and Vincent were directors of the corporation and knew the price Halstead originally paid for the Willoughby lots. If either one of them considered this information material, it seems that in the discharge of their duties as directors they would have disclosed it to their associates.

While the incident is somewhat confusing and is not altogether satisfactorily explained, there is no evidence in the record tending to show that Nelms, as apparent stockholder or otherwise, used any persuasion or made any suggestion to McKann to influence him from disclosing any information to the company, or that he did anything to influence the company in purchasing the property from Halstead.

(3) The third incident relied upon to establish fraud, or a breach of duty that Halstead owed to the corporation, was his failure to inform all the directors of the amount he paid for the lots, and that this failure, in view of the fact that the consideration he received from the corporation was more than three times the amount he paid for them, entitles appellee to rescind the sale.

It is settled that because of the relationship existing between an officer and a corporation, the officer cannot deal with the corporation at arm's length, even though the other directors are acting for it. Such officer cannot deal with the corporation as a stranger, because the position of confidence which he holds enables him to acquire an intimate knowledge of the affairs of the corporation and to influence those associated with him in its management. Fletcher on Cor-

porations, vol. 3, section 950. This, however, does not prevent an officer from dealing with a corporation, provided he does so in good faith and the sale is open, fair and honest. *Howland* v. *Corn* (C. C. A.) 232 Fed. 35.

In Virginia, we have adopted the majority rule, as heretofore quoted in *Waddy* v. *Grimes,* that such a transaction is *prima facie* presumed to be invalid, but the presumption may be rebutted. The only fact connected with the sale of these properties which it is claimed was not known by all the directors was the amount of the purchase price paid by Halstead for the lots. It is not contended that he failed to give any information sought by any director or stockholder. Spellman on Corporations states that a director acting for himself in a transaction with other disinterested officers acting for the corporation has fulfilled his duty when he discloses to such officers, (1) that he is acting in his own behalf, (2) that he has disclosed all the surrounding circumstances, or given an opportunity for full investigation, (3) that he has withheld no information requested by any director or stockholder. None of these conditions were violated by Halstead.

Appellee further contends that the price at which Halstead sold the Willoughby lots to the corporation was three times what he had paid for them, and that this was unconscionable.

██ As heretofore stated, the sale of these lots was only a part of the transaction between the parties. The pertinent inquiry is, did Halstead act in good faith and was the contract, as a whole, open, fair and honest at the time it was consummated. The only evidence from which any bad faith may be inferred is that Halstead failed to disclose to all the directors the amount the Willoughby lots had cost him. It is conceded that at least two of the directors knew what he paid for them. Several of the directors, testifying more than ten years later, stated that they did not know the cost price to Halstead until after his death. As might be expected, their recollection of the details of the transaction is somewhat hazy, due to the lapse of time. It

is difficult to conceive how Halstead could have brought home to his co-directors more forcefully than he did the fact that he was owner of the lots and the contract with Cofer, when he offered to sell them to the corporation for corporate purposes.

The only remaining question is, whether the transaction as a whole was fair and honest. The mere fact that Halstead made a profit on the Willoughby lots, under the circumstances narrated, is not sufficient to rescind the contract. The fairness of the contract must be determined from the conditions existing at the time the sale was made. The evidence discloses that for more than a year the corporation had been paying Halstead only half his former salary; that he was a man of unusual ability in developing and selling real estate; that the business affairs of the corporation were such that it would either have to liquidate or expand; that Halstead's various propositions made in the course of the year had been rejected. It was evident that Halstead, in order to regain his normal income would have to find some other outlet for his business activities. With this idea in mind, he obtained an option to buy the Fox Hall farm at $700 per acre. Halstead, in good faith, caused a charter for a new corporation to be formed and made tentative arrangements with new associates to develop and sell his own property. His first cousin, W. I. Halstead, a lawyer of South Mills, North Carolina, testified that he had tentatively agreed to move to Norfolk to assist J. Wiley Halstead in this new development, but just before, or immediately after, the corporation purchased the properties, he, at his cousin's request, came to Norfolk and they talked the matter over. His account of this discussion is as follows:

"He (J. Wiley Halstead) said that the directors had begged him to stay and had sent a committee to him, that they couldn't get along with the corporation without him, and he said 'What you and I have been talking about, about developing this property in a new corporation, will have to go, and you will have to make other arrangements or dis-

regard what I have talked about with respect to the business.' "

This cousin further testified that J. Wiley Halstead told him that before fully developing his plans for the new corporation, he conceived it to be his duty to give appellee an opportunity to purchase the properties from him.

In the notice for a meeting of directors to consider this offer of sale, Halstead stated, the proposition "will not be acceptable to the owner unless unanimously approved by the directors voting, as the owner is unwilling to sell it to this corporation if any one of the directors are opposed and is unwilling to sell separately at the price named." In a letter attached to the notice, he asked the directors if they did not approve to "be candid and frankly say so," and in the closing paragraph adds: "If I have to handle one of the properties in a separate corporation I prefer to handle both in the same way."

Appellee confines its attack to the sale of the Willoughby lots and introduced evidence tending to show that the value of these lots just a short time before this date was about $40 per lot. Appellants introduced experts on real estate values, who testified that in 1923 the lots were worth from $120 to $130, wholesale, that individual owners of lots in this area valued them at from $200 to $600, each. The tax assessors in 1925 endeavored to assess all real estate in Norfolk at sixty per cent of its market value and assessed these lots from $90 to $95 for taxable purposes. After Mr. Halstead's death, the corporation authorized a real estate broker to sell the lots to the government for $143 per lot. While this evidence is not conclusive, it shows that in the opinion of experienced real estate men $130 per lot was not an unreasonable price at the time of the sale to the corporation.

In determining the fairness of the sale, the value to the corporation of the Fox Hall farm must also be taken into consideration. The only evidence tending to show the market value of this acreage, other than the contract itself, was the testimony of Mr. Cofer. His evidence was confined

to the fact that just prior to the date of the contract, he had sold a few acres cut off from this tract and similarly situated for $1,000 per acre. However, in the light of later developments, it is conclusively proven that the acquisition of this acreage at the price paid was very beneficial to the corporation. Dividends earned from the sale of this acreage were regularly declared on the stock from 1923 until 1929, and in less than six years from April, 1923, the books of the corporation showed $75,000 in profits from the sale of this property, with the corporation still owning the Willoughby lots, which it seems to have made no serious attempt to sell.

The assets of the company consisted of unsold lots, notes and bonds, payment of which was secured by first and second liens on the different properties sold. When the present depression included Norfolk and vicinity in its world-wide sweep, the values of these assets, like values everywhere, greatly depreciated. Appellee, basing its claim upon the reduced value of these assets, contends that the results of the development show a loss instead of a profit, and if its contention were sustained Halstead's estate would be compelled to bear the total loss occasioned by economic conditions over which neither Halstead nor the corporation had any control. Appellee attempts to minimize the fact that before the depression the sales from the Fox Hall farm showed a profit, on the ground that this undertaking was purely speculative. This is true, but it applies with equal force to the Willoughby lots. The entire business of this corporation was highly speculative.

The best evidence tending to prove contemporaneous values and the fact that the sale was beneficial to the corporation is the recorded statement of the stockholders and directors. At the January meeting of stockholders some nine months after the sale was consummated, that is on January 10, 1924, a resolution was passed approving the action of the directors in buying the Willoughby lots and the Fox Hall farm. At a meeting of stockholders held on January 28, 1925, a special committee was appointed "to

make a general survey of the books, operations and property of the corporation, and to make such criticisms, suggestions and recommendations relative thereto as they might deem expedient." This committee made its report at a board of directors' meeting held on June 25, 1925, in which we find the following significant paragraph:

"We have no adverse criticism to make regarding the manner in which the affairs of the corporation have been handled, nor have we any suggestion to offer, but on the contrary it is our opinion that the corporation has been admirably managed by its officers and this committee believes that no suggestions from them are necessary in view of the past record of the affairs of the corporation; to the success of which our worthy president—Mr. J. W. Halstead— has so ably contributed and we believe that he is fully able to meet the problems of the corporation as they come up from time to time, and to substantiate our views notwithstanding the fact that the year 1924 was regarded as unfavorable to the real estate business, the corporation sold some lots in 'Ballentine Place,' *has most phenomenal success in 'Fox Hall,' and we believe when the logical moment arrives to launch activities in Willoughby the present management will rise to the occasion and show the stockholders that our investment there was by no means a blunder.* We sincerely and heartily commend the officials of the corporation and congratulate the stockholders for having such efficient officers to conduct their affairs." (Italics supplied.)

McKann, a member of the committee, knowing what Halstead paid for the lots, signed the above report which shows that more than two years after the date of the sale an investigating committee was entirely satisfied with the acquisition of these properties at the price stated, and that this report was unanimously adopted by the directors and a copy mailed to each stockholder. Before the sale, Halstead insisted upon the directors making an independent investigation of these properties, and offered to take them to view the same. After the sale, the stockholders appointed a committee to make a detailed investigation of the affairs

and the properties owned by the corporation, and specifically requested criticism. This committee, some five months later, seemed not only satisfied but enthusiastic over the acquisition of these properties. No objection was raised to the sale until seven years later, more than ten years from the date of sale, at a time when because of economic conditions there was a great reduction in the value of all properties.

Viewing the case as a whole, we find that in making the sale to the corporation Halstead (1) did not attempt to act for the corporation; (2) that he made no misrepresentation of fact; (3) that he withheld no information sought by any director or stockholder; (4) that he insisted upon the directors viewing the properties and determining for themselves their value to the corporation; (5) that the price paid, in view of all the circumstances, was not unreasonable; (6) that at least two of the directors knew what the Willoughby lots cost Halstead; (7) that the stockholders, with full knowledge that the corporation had purchased the properties from one of its officers, ratified the sale; (8) that more than two years after the sale a committee of stockholders, charged with the specific duty of investigating the properties of the corporation, made an enthusiastic report on the prospect of making substantial profits on this investment, which report was ratified by the directors; and (9) no objection was raised to the sale until more than ten years had elapsed, when there had been a substantial change in economic conditions. Under such circumstances, to permit a rescission of the contract would be grossly inequitable.

For the reasons stated, the decree from which this appeal was taken is reversed, and a final decree dismissing the case will be entered.

*Reversed and dismissed.*