## BALTIMORE & O. R. CO. v. FOAR.
### No. 5583.

Circuit Court of Appeals, Seventh Circuit.
May 25, 1936.

68

Charles D. Clark, Henry D. Sheean, and E. W. Lademann, all of Chicago, Ill., and H. W. Mountz and George E. Mountz, both of Garrett, Ind., for appellant.

Samuel D. Jackson, of Fort Wayne, Ind., J. D. Brinkerhoff, of Garrett, Ind., and Howard S. Grimm and Dan M. Link, both of Auburn, Ind., for appellee.

Before EVANS, SPARKS, and AL-SCHULER, Circuit Judges.

SPARKS, Circuit Judge.

This was an action by appellee to recover damages for breach of an oral contract. The jury returned a verdict for $4500, upon which a judgment was rendered, and from that judgment this appeal is prosecuted.

The errors assigned and relied upon are (1) overruling appellant's demurrer to the complaint, (2) refusing to direct a verdict for appellant at the close of the evidence, and (3) failure to give to the jury appellant's requested instruction to find for the appellant.

The material allegations of the complaint are in substance as follows: Appellant, a railroad corporation organized under the laws of Maryland, had for many years operated its road through Indiana, where it owned and operated repair, machine, and construction shops at Garrett, in which a large number of men were employed. In 1911 appellee was employed by appellant as a machinist's helper in the repair shop, and continued in such employment until 1919, when he was transferred to the car department as a carman's helper, where he continued to work as such until July, 1922. In that month a general strike was called by the machinists and other crafts in the shops at Garrett and at all other points on appellant's line from Baltimore to Chicago, and appellee and all other members of his craft, and of the union organization walked out.

Thereafter, appellant, by Howard W. Mountz and the company's shop superintendent, Robinson, and by its officers and representatives in charge, requested and urged appellee to return to his work, and promised him that if he would do so during the pendency of the strike, appellant would provide permanent and continuous employment for him during his lifetime at the same wages received by him previous to the strike. Appellee accepted the promise and in reliance thereon returned to his work in August, at a daily wage of $4.72. He was retained in said employment by appellant, which acknowledged the same to be in consideration of its promise and agreement, until May 15, 1931, when he was discharged without cause or fault on his part. Appellee had performed his part of the contract and was at all times ready, willing and able to continue to do so, but

was prevented by appellant from so doing. The complaint concluded with allegations of general and special damages resulting from the discharge.

It is suggested, rather than urged, by appellant, that the complaint is not sufficient to withstand the demurrer, because it lacks allegations showing that the persons alleged to have made the contract for appellant with appellee had authority to bind appellant. In oral argument, however, appellant conceded that the complaint was probably good as against the demurrer. With this admission, we quite agree, for if, as alleged, appellant by its representatives entered into the agreement, that allegation of necessity includes the further allegation that the representatives had authority to so bind appellant. If, however, this were not so, the complaint would still be sufficient to withstand the demurrer because of the further allegation that appellant subsequently ratified the acts of its representatives who entered into the contract. The authorities relied upon by appellant with respect to this assignment are not inconsistent with our conclusions. The demurrer was properly overruled.

The remaining questions depend for solution upon the proof that was introduced and the facts that must be conceded to have been found by the general verdict of the jury. They are summarized as follows: Appellee was employed by appellant in March, 1911, as a machinist's helper. In May he was put to work packing boxes on engines and drivers. In 1919 he became a tank tender, and his work continued until within a few days before the strike on July 1, 1922. At that particular time he was temporarily away. He owned a small farm of seventeen acres near Garrett, on which was a modern nine-room house, where he lived with his wife and five children ranging in age from five months to twelve years. They attended church at Garrett, and the children of school age attended school at Garrett. At the time of the strike, Howard W. Mountz was a member of the firm of Mountz and Brinkerhoff, local counsel for appellant. After the strike was called, Mountz called at appellee's home and in the presence of appellee's wife and children said that appellant wanted appellee to return to work; that they needed someone to break the ice so that the others would follow, and that if appellee would return to work the company would give him a lifetime job at the same wages that he had been getting. The wife refused to assent, and Mountz urged her to do so because her husband would then have a lifetime job, which he would need in order to educate his children. He further assured them that the company would protect him and his family. The next day appellee called at Mountz' office where Mountz repeated the promise to him of a lifetime job at his previous wage, and protection to him and his family, whereupon appellee agreed to return to work under those conditions. The next morning before daylight appellee went to the shops by a by-path so that the union pickets around the shops would not see him. The shops were surrounded by a high fence and guarded by over one hundred armed special police officers. There appellee was taken charge of by Robinson, hereinbefore referred to, who had formerly been a superintendent on the road, but at and for some time previous to the strike was an executive officer of the railroad, being the superintendent of fuels over the entire system of eleven thousand miles. At that time, there were no other persons at work except officials and strangers who were brought in and housed in coach cars and fed from a commissary in the shop yards.

On the night following appellee's return to work, his house was surrounded by union pickets who threatened to blow it up. They remained there all night, some staying on the porch, and the family was kept up all night by their threats. They returned to appellee's home the next night and conducted themselves in the same manner as before, threatening to blow up the house, to break the windows and to kill appellee's cow. The next morning appellee's wife, with her five months old baby, went over to the gate surrounding the shop yards. She sent for her husband and told him of the actions and threats of the pickets, and he told her he would go home. When he started to do so he was met by Robinson and one Sapp, who was chief of the railroad police at Garrett. Robinson urged him not to go home; that the damage had already been done; that the union men would have it in for him anyhow, and that he had a life job with the company if he would stay. Appellee insisted on going home and Robinson accompanied him, and conferred with appellee's wife. At that time, two dozen strikers were on a nearby overhead bridge watching the house. Robinson urged up-

on appellee and his wife the duty of appellee to return to work; that he had a life job and that it was necessary for him to rear and educate his children, and give them an opportunity, and if he would return, the company would protect him and his family from harm. Thereupon, appellee returned to his work.

The strike was settled in September, and the returning strikers immediately began to harass appellee. They put grease in his lunch, hid his tools, called him names and interfered with his work in order to make trouble between him and the company. As a result of this conduct, appellee went to consult Mr. Mountz at his office and Mountz gave him a letter to Robinson at Baltimore. He went to Baltimore but Robinson was not in and he delivered the letter to Robinson's clerk. He undertook to see vice-president Galloway, and waited all day for that purpose, but without avail. Upon his return he was reproached by the master mechanic, the general foreman and the division superintendent for going to Baltimore over their heads. The division superintendent told him they did not want him to do this any more and they would give him satisfaction, as he had orders from Baltimore to protect him and take care of him.

In 1926 appellee was furloughed. He consulted with the master mechanic, Short, and reminded him of his life contract with the company, and asked him if he should take the matter up with Baltimore. Short instructed him to return the next day. This he did and he was asked if he would take a job cleaning coaches at the depot, to which he replied that he would do anything to make a living so long as he was not discharged, and Short then told him he would not be discharged. The regular scale for cleaning coaches was thirty-nine cents an hour, but the company paid him fifty-four cents per hour for that work. In about three months the superintendent notified him that he was being paid fifty-four cents for work which should be paid for at the rate of thirty-nine cents per hour, whereupon, he wrote to the superintendent, and his wages were not cut.

He was furloughed again on May 15, 1931. At that time he reminded the division superintendent of the promise that had been made to him during the strike. Thereafter he made repeated applications to appellant for employment; he talked to Mountz, and again went to Baltimore and saw President Willard, but without avail. He was never afterwards given any work by appellant, although he was at all times ready, able and willing to return to work. He made repeated efforts to secure employment elsewhere, but he was black-listed by the unions at other plants. He was on furlough from May 15, 1931 to December, 1932, when he was discharged by appellant.

The verdict of the jury establishes the fact that the contract was made with appellee by Mountz and Robinson who for that purpose essayed to act as representatives of appellant. It must be conceded that in so doing, neither Mountz as local counsel, nor Robinson as superintendent of fuel for the entire system of appellant's railroad, acted within the scope of the duties of those respective employments. Even so, their duties may have been enlarged by appellant; under the exigencies of the situation then present, to such an extent as to authorize the contract; or appellant may have subsequently ratified the unauthorized contract, in which event it would be valid ab initio. The record discloses no direct evidence that the authority of either Mountz or Robinson was expressly enlarged beyond their usual duties, but we think it does disclose facts and circumstances which tended to prove that appellant had ratified the contract.

The consensus of judicial opinion throughout the United States is that a corporation by its proper officers may lawfully enter into a life contract with an employee. It is equally well settled that a corporation by its proper officers may ratify such a contract entered into by certain of its officers without authority, but the unauthorized contract may not be ratified by those who have no authority to make it, and there can be no ratification unless those so acting with authority have full knowledge of all the material facts at the time of the ratification. These propositions are not controverted by counsel.

Primarily, the board of directors is the true agent of a corporation, and the actions of the directors as a board, if within the scope of the corporate charter, are binding upon it. Theoretically, no act of any employee or officer is binding on the corporation unless it is authorized or subsequently approved by the board of directors. The duties of officers and heads of departments are usually defined in the by-laws, and what is actually done in the

operation of the business comes to the knowledge of the board of directors, as a rule, through reports of the officers and the heads of departments. The court judicially knows that the ordinary contract of employment in a highly organized corporation, such as appellant, is not entered into by the board of directors, and yet it theoretically approves such contract subsequently by approving the report from that department. It is said, however, that the contract at bar is an unusual one in that it purported to run during the life of appellee, and that it should not be upheld unless express authorization or approval by the board is shown. Such contracts were properly characterized in the earlier decisions as unusual. However, from the number disclosed in the more recent cases, we are impressed with the fact that they are not now as unusual as they were. Be that as it may, it is worthy of note that the defense is usually the same, that is to say, that the contract was entered into without authority from the board, and without their knowledge or ratification.

A board of directors is not only bound by what it actually knows, but it may be bound by what it ought to have known, or by proper attention to its business would have known. In Knights of Pythias v. Kalinski, 163 U.S. 289, 16 S.Ct. 1047, 1051, 41 L.Ed. 163, the Court said, "If the company ought to have known of the facts, or, with proper attention to its own business, would have been apprised of them, it has no right to set up its ignorance as an excuse."

It is fair to presume that the board of directors and the higher officers at Baltimore were fully aware of the serious situation occasioned by the strike. It not only involved appellant's entire properties, but it was nation-wide in its scope. Appellant's huge repair, machine and construction shops were at Garrett, where practically all the population of that city were employed. So far as the record discloses, none of the directors or high officers of appellant resided nearer than Baltimore. All of the men at Garrett, save the heads of departments, walked out, and the appellant moved in strike-breakers, and maintained and sustained them night and day at the plant. Windows were broken in large numbers, bombs were thrown on the premises, and property was being destroyed. Summary and substantial direction and as-

sistance were imperative, in order to protect property and to keep the trains running. Robinson was sent there by appellant's authorities at Baltimore. It is true that he was appellant's superintendent of fuel, but it is not disclosed that he performed any of the duties of that office on that trip. It is obvious from the record that he came there to lend whatever assistance he could in protecting appellant's property and in breaking the strike. The heads of the departments likewise were doing the same and all engaged in manual labor which ordinarily was not within the scope of their respective employment. The company had one hundred ten special guards present doing police duty under the supervision of Sapp, and their duty was to protect the company's property, to see that there was no violence, and to get striking employees to return to their work. Sapp at times took instructions from Robinson. When appellee's wife reported to her husband that the strikers had been disturbing their home and appellee told Robinson he was going to quit work on that account, Sapp heard Robinson tell appellee not to quit; that "under the condition which he was promised his job back he would lose the B. & O. job for life; that he had been promised a lifetime job, and if he quit them he would be through." Robinson further said to appellee, "I will take you to your wife and we will talk it over at your home." Sapp further said, "When Mr. Robinson came to Garrett he was in the shops all the time. He seemed to be supervising the shop work. * * * I saw him about every hour, I guess, for a few months. He came very shortly after the strike was called. I don't know just when, just a day or two. * * * During my association with Mr. Robinson, during that strike, he was through the shops all the time and handling the men over there * * * everything was Mr. Robinson. * * * Mr. Robinson didn't do anything with the men that were out, that I know of. While the strike was in progress, I talked with Mr. Robinson with reference to the men who were on strike."

There was contradictory evidence as to whether Robinson's authority while at Garrett exceeded that of the regular superintendent or superintendents of the plant. That, however, is not material. They were all there with a large group of strike-breakers and special guards, and from the record we are warranted in be-

lieving that they were armed with power, by authority from headquarters at Baltimore, to handle the situation at Garrett during the strike as seemed best to them for the interests of the company. The record discloses that one of their great desires was to induce the striking men to return to their work, and appellee was the first striker to return. For years he had been their faithful and trusted workman, and they were sure if he returned others would follow. The record also discloses that when he returned to work he was paid not less than union wages measured by the character of work he did immediately before the strike. It is true that the wage received by appellant after he returned varied from seventy-five cents to fifty-one cents an hour, while in fact, he was receiving fifty-eight cents an hour when the strike began. Appellant relies upon this fact as negativing the contract relied upon, because at no time after returning did appellee receive the exact amount an hour which he had received at the time the strike began. Appellant at all times in question paid union wages to all of its employees, although it employed both union and non-union men. Appellee was a union man and was aware of that fact. We think that the terms of the contract with respect to continuously paying appellee the same wage as before was intended by both parties to mean that he was to receive the union wage based upon the character of work he was performing at the time of the walkout. To have intended otherwise might have resulted in a violation of the terms of the wage agreement existing between appellant and the union. Their subsequent conduct supports this construction, for when later appellee was required to clean cars, which service was rated under the union wage, at thirty-nine cents an hour, he was still paid fifty-four cents an hour, which at that time was the union wage for the same kind of service which he was rendering when the strike began.

With respect to appellant's knowledge of and acquiescence in the contract sued upon, we think it fair to assume that those in authority at Garrett performed their duties with reference to reporting to their superiors both at Garrett and at Baltimore. We further think it fair to assume that those in authority at Baltimore, including the board of directors, gave proper attention to the reports made to them, and to the company's business and operations during and after this very serious labor controversy.

The record discloses certain circumstances in support of those presumptions from which we think the jury was warranted in finding that those in authority both at Garrett and at Baltimore knew of the contract and ratified it. The jury was warranted in believing that Robinson had charge of affairs at Garrett while he was there. He had knowledge of the contract, for he repeated the precise terms of it to appellee, in the presence of Sapp, and to appellee's wife, and urged its continuance for the sake of appellee's family. The statement of the superintendent after appellee's trip to Baltimore that they had orders from Baltimore to take care of him, and the payment of the scale of wages due for the work he had been doing when the strike began instead of the lower scale for the work he was actually doing after the 1926 furlough, are important circumstances in support of the presumptions. In neither case is it probable that the master mechanic or the superintendent relied solely upon what appellee told them; it is much more reasonable to assume that they consulted, each with his own superior, and thus verified appellee's statement, and were convinced that appellee had spoken the truth. Under those circumstances, we are convinced that the court was right in submitting the facts to the jury, and that the jury was warranted in finding that the contract was entered into and was ratified by those in authority who had a right to do so. It is true that actual knowledge of the contract was not traced to the board of directors, but we do not think that was necessary under the circumstances. It was traced so far in that direction as to warrant the jury in believing that the board ought to have known of the contract, or with proper attention to its business would have been apprised of it. To hold otherwise would be to say that all those involved and in authority at Garrett failed in their duty to their company. Under these circumstances, we think appellant has no right to insist on its ignorance as a defense to the action.

Certain acts of appellee were urged as a valid reason for his discharge. The facts with respect thereto were submitted to the jury under proper and unassailed instructions, and we can not disturb the verdict.

Judgment affirmed.