**In re ADAMS LABORATORIES, INC., Debtor.**

**ADAMS LABORATORIES, INC., Plaintiff,**

v.

**Charles B. GARRETT, Sr., Defendant.**

**Bankruptcy No. 77–243–A.**

United States Bankruptcy Court, E. D. Virginia, Alexandria Division.

April 7, 1980.

Bruce Goldstein, Greenbaum, Gins & Goldstein, P. C., Washington, D.C., for defendant.

Geoffrey Judd Vitt, Alexandria, Va., Caplin & Drysdale, Washington, D.C., for plaintiff.

## MEMORANDUM OPINION

MARTIN V. B. BOSTETTER, Jr., Bankruptcy Judge.

Plaintiff, Adams Laboratories, Inc. (hereinafter Adams) is a debtor-in-possession in a Chapter XI proceeding under the Bankruptcy Act presently before the Court. Defendant, Charles B. Garrett, Sr., filed a claim (No. 6) against Adams on May 9, 1977, in the amount of $183,585.26.[1] Adams filed a complaint against Garrett, subsequently amended on August 7, 1978, objecting to Garrett's claim and asserting certain counterclaims against him.

The claim filed by Garrett allegedly represents the unpaid balance of an employment agreement executed by Adams with Garrett in the amount of $200,000.00, payable over a ten-year period at $20,000.00 per year. Adams' contention is that there exists no valid consideration on Garrett's part, thus rendering the employment agreement unenforceable. Adams further argues that Garrett must account for secret profits he received upon the sale of Dixie Industries, Inc., to Adams allegedly in violation of his fiduciary duties to Adams as a director of said corporation.

In order to properly deal with the issues, an understanding of the past relationship between Garrett, Dixie Industries, Inc., and Adams in necessary.

It is uncontroverted that Garrett is extremely knowledgeable in developing and marketing blended oils and fats as an energy supplement to the animal feed industry. In one fashion or another, he has been involved in this business since 1932.

In 1948, Garrett formed Midland-Western, Inc. The purpose of this company was to develop and sell fat feed products to the animal feed industry. The company encountered severe financial difficulties, however. It declared bankruptcy and was formally discharged of its debts on July 30, 1967.

Garrett, desirous of expanding Midland-Western's operation into the southeastern United States, formed Dixie Brokerage Associates in 1960. It was renamed Dixie Industries, Inc., in 1964. Joining Garrett as stockholders were Howard Askew, Charles Brigham and Herbert Hannah. Hannah later withdrew as a stockholder.

Garrett informed Brigham and Askew in the early part of 1967 that Midland-Western was experiencing financial difficulties. Dixie made a loan shortly thereafter to Garrett in the amount of $10,000.00. Garrett pledged his stock in Dixie as collateral for the loan. Garrett subsequently sold his Dixie stock which represented his interest in the company in return for cancellation of the $10,000.00 note. He resigned his position as a director of Dixie, although he remained on the payroll as a consultant from 1968 to 1974.

Garrett, and his sons, Roger Garrett and Charles Garrett, Jr., formed Adams Laboratories, Inc., which was incorporated in Pennsylvania in 1968. The Garretts did not pay cash for their shares. Rather, they

---

1. The parties entered into a stipulation at trial that when the thirty-five percent recovery under the Plan of Arrangement is applied to the value of amounts remaining under the employ-

ment agreement, a maximum recovery of $43,-683.16 will result should the Court find for Garrett.

contributed their technical and marketing knowledge of the fat feed product business to the corporation. Garrett's share of stock was divided between his sons. All three were made directors of Adams. Roger Garrett was also made president of the corporation.

Between 1970 and 1971, Adams relocated its offices to Virginia and obtained additional outside funding. From December 1971 until December 1973, the following additional directors were named to the Adams' Board of Directors (hereinafter the Board). Willard Eason, Hans Kahn, Jack Prizzi and Jimmy Rabon. On December 11, 1973, Raymond Frankel and Alan Patricof also became members of the Board.

At the request of the Adams Board, Garrett initiated discussions with Brigham and Askew about a possible merger of Adams with Dixie in 1971. Although Adams was successful in securing an option to buy Dixie, the option expired in 1972 without being exercised by Adams.

In 1973, Adams expressed renewed interest in purchasing Dixie. Donald Pennington, Financial Vice President of Adams and Secretary and Treasurer as well, directed discussions about a purchase of Dixie by Adams. Jack Prizzi was selected by the Board to conduct a thorough independent investigation of Dixie. Prizzi was selected by the Board for his expertise in analyzing the financial condition of business enterprises. Pennington assisted in the preparation of the report. The Board met in December 1973 to consider the report submitted by Prizzi. At that meeting both Prizzi and Pennington recommended the acquisition of Dixie. Garrett abstained from any discussions pertaining to the acquisition of Dixie, nor did he cast any votes on said acquisition.

On April 25, 1974, the Board made a final decision to acquire Dixie. Adams established a subsidiary corporation known as Dixie of Delaware, which purchased eighty percent of Dixie's stock, while Adams purchased the remaining twenty percent. Adams closed the stock purchase agreement with Dixie on May 1, 1974.

Subsequent to the sale of Dixie to Adams, Garrett received the sum of $56,250.00 from Brigham and Askew. This was a partial payment of compensation for Garrett to be paid to him by Brigham and Askew in the amount of $76,250.00.

Inasmuch as Garrett would lose income from his position as a consultant to Dixie upon its sale to Adams, and as he was desirous of retiring from Adams, the latter executed an employment agreement with him on July 30, 1974. At that time Garrett's salary as an employee of Adams was $33,000.00 per year. He was then 68 years of age. In addition to acting as a consultant to the Board, Garrett covenanted not to compete with Adams for a two-year period within certain geographically defined areas, or to divulge confidential information and trade secrets known to him regarding Adams.

Several issues are presented before the Court for resolution based upon evidence submitted by the parties and the record in this case. First, the Court must consider whether Garrett was in breach of his fiduciary duty to Adams by accepting a fee from Brigham and Askew. If the Court so finds, a determination must be made as to whether Garrett must make an accounting and return to Adams any funds he received. Second, the Court must examine the employment agreement entered into by Adams with Garrett to determine whether the latter gave consideration. Should the Court find that consideration does exist, it must examine the circumstances surrounding the transaction to ensure that there exists no fraud as between the parties.

 Officers and directors of a corporation occupy a fiduciary relationship to the corporation. *Finefrock v. Kenova Mine Car Co.*, 22 F.2d 627 (4th Cir. 1927). A director's fiduciary duty to a corporation has been likened to a position of trust. He is often denominated a trustee under theories of implied or constructive trust, and is held accountable in equity as such. *Coronado-Inglenook Land & Development Co. v. Black*, 198 Va. 772, 96 S.E.2d 737 (1957).

He must conduct himself with the utmost fidelity, and with his private and personal interests subordinated to his trust duty whenever the two come in conflict. *Marcuse v. Broad-Grace Arcade Corp.*, 164 Va. 553, 180 S.E. 327 (1935).

Plaintiff advances the argument that Garrett did not exercise good faith, honesty and fidelity to it by compromising his position as a director when he allegedly sought out and obtained compensation from Brigham and Askew for the sale of Dixie to Adams. Plaintiff maintains that Garrett's actions are in direct violation of the fundamental precept enunciated by the Supreme Court of Appeals of Virginia in *Rowland v. Kable*, 174 Va. 343, 6 S.E.2d 633, 642 (1940), where it was stated: "[t]hus a person cannot be a purchaser of property and at the same time the agent of the vendor."

It is not law in Virginia that a director is absolutely precluded from dealing or entering into a contract with the corporation. It has been stated "that where persons holding positions of trust and confidence in a corporation deal with the corporation, which is also represented by others, in entire good faith, fairness and honesty, such transactions are not invalid and will be upheld." *Rowland v. Kable,* 6 S.E.2d at 645, (Hudgins, J., concurring).

The Court must determine whether Garrett actively dealt in the Dixie-Adams transaction in violation of his fiduciary duties; whether Adams was competently represented in its negotiations with Dixie; whether knowledge acquired by the representatives authorized to negotiate with Dixie may be imputed to Adams; and whether Garrett intentionally misinformed and hindered Adams from determining the nature and circumstances surrounding its purchase arrangement with Dixie.

The Court finds that Garrett was not an active participant in the Dixie-Adams transaction. The Court is not persuaded by the plaintiff's contention that Garrett violated Article XI, Section 11.1 of the Stock Purchase Agreement between Dixie and Adams which provided that "[t]he parties hereto represent that they have not employed any broker or finder in connection with the transactions contemplated hereby."

Donald Pennington, Vice President of Finance and Administration, as well as Secretary and Treasurer of Adams, testified that use of the term "finder's fee" by the parties was only a form of art rather than in the true sense a finder's fee. He stated unequivocally that "[t]here was nobody involved in this transaction that [c]ame anywhere close to being called a finder in your normal Wall Street terminology."

Garrett testified that the compensation he received from Brigham and Askew was not in the nature of a "finder's fee", but rather was a "founder's fee". Brigham corroborated Garrett's testimony by stating that he and Askew felt a moral obligation to compensate defendant because "Dixie had been a tremendous business for us". He stated further that if "it had not been for Mr. Garrett, we would not have been in the business." Brigham testified that he made these feelings clear to Adams' management and told Pennington in the presence of Jack Prizzi (a director of Adams) what he felt that he owed Garrett. Alan Patricof, a director of Adams, also testified that both Pennington and Prizzi had told him of Brigham and Askew's desire that Garrett receive compensation out of a sense of moral obligation.

Garrett testified that he in no way arranged the sale of Dixie to Adams. Hans Kahn, a director of Adams, acknowledged that Garrett left the board room when the Board considered whether or not to purchase Dixie. Garrett abstained from voting on the Dixie acquisition when it was presented to the Board for resolution. Brigham testified that Garrett played no role in the negotiations and in no manner did Garrett attempt to influence him as to the sale or for any compensation to be paid to Garrett following the sale. Garrett did not act as an intermediary between Dixie and Adams, nor was he authorized by the Board to do so. Pennington testified that Garrett was not active in the negotiations and did not assist him in arranging the sale.

Pennington testified that it was his basic responsibility to negotiate for Adams with Brigham and Askew on the sale of Dixie to Adams. Pennington testified also that he kept Adams' directors apprised of the progress of negotiations with Dixie. Patricof substantiated Pennington's statements by testifying that Pennington was the principal negotiator for Adams and that he kept members of the Board well advised of the status of the negotiations.

The Board directed Prizzi to conduct a thorough investigation of Dixie's financial condition and potential for future growth in association with Adams. Upon presentation of the Prizzi report to the Board, both Prizzi and Pennington recommended that Adams acquire Dixie. Reflecting on his decision to recommend the purchase of Dixie, Pennington stated that he still believed the total price paid by Adams to be a fair one.

The Court can reach no other conclusion but that Adams was competently represented by Pennington and Prizzi. The Court further finds that both Pennington and Prizzi were authorized by the Board to conduct negotiations with Dixie.

■ The relationship between a corporation and its directors is similar to that of agency, and directors possess the same rights and are subject to the same duties as other agents. *Bocock v. Allegheny Coal, etc. Co.*, 82 Va. 913, 1 S.E. 325 (1887), *reversed on other grounds, Coal River Collieries v. Eureka Coal & Wood Co.*, 144 Va. 263, 132 S.E. 337 (1926). It is well settled that agency precepts apply to officers and agents of a corporation. *Axelrod v. Premier Photo Serv., Inc.*, 154 W.Va. 137, 173 S.E.2d 383 (1970).

■ The general rule is that a director of a corporation is held chargeable with knowledge of such corporate affairs as it is his duty to know and which he might have known had he diligently discharged his duties. *Balt. & O.R. Co. v. Foar*, 84 F.2d 67 (7th Cir. 1936). The Seventh Circuit in *Foar* concluded that "[a] board of directors is not only bound by what it actually knows, but that it may be bound by what it ought to have known, or by proper attention to its business would have known." *Id.* at 71. The United States Supreme Court in *Knights of Pythias v. Kalinski*, 163 U.S. 289, 298, 16 S.Ct. 1047, 1051, 41 L.Ed. 163 (1896), observed that if the company in question "ought to have known of the facts, or, with proper attention to its own business, would have been apprised of them, it has no right to set up its ignorance as an excuse."

The Fourth Circuit Court of Appeals in *Duplex Envelope Co. v. Denominational Envelope Co.*, 80 F.2d 179, 182 (4th Cir. 1935) noted the general rule that a corporation is affected with constructive knowledge "of all material facts of which an officer acquires while acting in the course of his employment and within the scope of his authority." [2] The knowledge acquired by a secretary and treasurer who conducts negotiations with a third party with authority from the corporation to do so will be imputed to the corporation. *Id.*

In the instant matter it has already been established that Pennington was Secretary and Treasurer of Adams during the course of his employment with Adams. Acting merely as Secretary and Treasurer did not give Pennington the authority, by virtue of these offices alone, to speak for or bind Adams to an agreement with Dixie. The record does reflect, however, that he was

**2.** The District Court in *United States v. T.I.M. E.–D.C., Inc.*, 381 F.Supp. 730 (W.D.Va.1974) considered the issue of imputation of knowledge acquired by employees to the corporation. The court held in part that a "corporation is considered to have acquired the collective knowledge of its employees and is held responsible for their failure to act accordingly." *Id.* at 738. *See also, Princeton Power Co. v. Hardy*, 103 W.Va. 329, 137 S.E. 362 (1927), where a director-defendant acted as a broker for a third

party in the latter's negotiations with Princeton Power. The plaintiff-corporation was represented by its chief executive officer who knew of defendant's compensation from the third party. Several of plaintiff's directors were also aware of the compensation arrangement. The Court held that the knowledge of such compensation acquired by the officers and agents employing the director-defendant as a broker will be imputed to the corporation.

authorized by the Board to conduct negotiations with Dixie. The record indicates that Pennington performed his duties diligently over a considerable period of time, and that he kept the Board apprised of the progress of the negotiations with Dixie. There exists no evidence in the record to indicate that Pennington did not act in the best interests of Adams while negotiating the acquisition of Dixie with Brigham and Askew.

The record reflects that the prime mover in the negotiations with Dixie was Adams. Pennington testified that because Brigham and Askew were not very financially sophisticated, it was incumbent upon Adams to do "almost all of the number work". Adams apparently was desirous of entering the market area in which Dixie was operating. Pennington testified that in order for Adams to grow:

> ". . . [I]t was obvious that at some point in time we would have to move into the strategic markets that were serviced by the Canton, Georgia, and Jackson, Mississippi, plants [operated by Dixie] so in time, it was also felt we would have to make an evaluation, whether it would be cheaper to buy Dixie or build our own plants and compete with them."

(Pennington testimony, T–234). Brigham testified that the only reason he even agreed to sell Dixie to Adams was because Askew was inclined to do so.

Testimony was heard to the effect that the principal stumbling block in concluding the Dixie acquisition was the amount of compensation to be given to Garrett. Pennington testified that as Garrett had no stock in Dixie he could not be compensated by Adams when it acquired Dixie. He concluded that the only solution was to negotiate a total price with Brigham and Askew which would be fair to them as well as to Adams. Brigham and Askew could then determine independently of the Dixie-Adams transaction what amount of compensation they desired Garrett to receive. As Pennington put it, "[t]hey could take it [the proceeds of the sale] to Las Vegas as far as [he] was concerned."

Although Pennington admitted that he never formally communicated information to the directors at a meeting of the Board that Garrett was to be compensated by Brigham and Askew, he did testify that this information was known to at least three members of the Board; Prizzi, Patricof and Roger Garrett. He testified further that other members of the Board probably knew of the compensation arrangement through background papers which he sent to them prior to meetings of the entire Board.

The Court finds that Pennington acted for Adams in the Dixie-Adams negotiations independent of any influence by Garrett. He kept the Board well apprised of his actions, and was specifically authorized by the Board to conduct negotiations with Dixie. Several directors knew of the compensation arrangement and the weight of the evidence suggests that other members of the Board probably knew about it as well. As there is no evidence in the record which indicates that he concealed material information from the Board, the Court finds that the Board must be held to constructive knowledge of the compensation arrangement between Brigham, Askew and Garrett.

The Supreme Court of Appeals of Virginia in *Deford v. Ballentine Realty Corp.*, 164 Va. 436, 180 S.E. 164, 169 (1935) established those steps which a director should take to ensure that he dealt openly and fairly with the corporation. The *Deford* court stated:

> "[A] director acting for himself in a transaction with other disinterested officers acting for the corporation has fulfilled his duty when he discloses to such officers (1) that he is acting in his own behalf; (2) that he has disclosed all the surrounding circumstances, or given an opportunity for full investigation; (3) that he has withheld no information requested by any director or stockholder."

Testimony adduced at trial indicates that Garrett first became aware he might receive compensation from Brigham and Askew when he attended a meeting in one Charles Webb's [the accountant for Dixie]

office in Atlanta, Georgia, in March 1974. Garrett testified that Brigham, Askew, Pennington and, possibly, Prizzi were present at this meeting. Webb passed a document among the parties which set out the financial setup between Dixie and Adams. It included a reference that Garrett was to receive $76,250.00 from Brigham and Askew if the sale was successfully concluded. Garrett testified that he did not question this amount nor did he participate in the discussion. He felt what was being done for him was out of kindness.

Garrett testified that he did not formally notify the Board of his impending receipt of compensation from Brigham and Askew because the matter was being handled by other members of the corporation. He "assumed that everyone knew about [the compensation arrangement] . . . as much or more than [he] did". Garrett stated that Pennington was present at the meeting and saw the document containing the reference to the compensation arrangement. According to Garrett, Pennington neither expressed shock nor surprise as to the sum of money Garrett was to receive.

■ The relationship between a director and his corporation is one of trust, and the Court must subject the dealings of a director with his corporation to close and rigorous scrutiny. *Bayliss v. Rood*, 424 F.2d 142, 146 (4th Cir. 1970). Viewing as a whole the circumstances surrounding the compensation arrangement between Garrett and Brigham and Askew, the Court is of the opinion that Garrett did not act for Adams in the latter's negotiations with Dixie. Although Garrett did attend several meetings in which discussions took place between representatives of Adams and Dixie, he did not participate in such discussions.

The weight of the evidence supports Garrett's testimony that he believed Adams' management was aware of the compensation arrangement and that that information had been communicated to members of the Board. In any event, the Court has determined that the knowledge acquired by Pennington with respect to the compensation arrangement will be imputed to the Board.

It cannot be said that Garrett hindered Adams' Board or management from making a full investigation of Dixie. Brigham and Askew's feelings toward compensating Garrett were well known to the Board and the management of Adams. Several directors of Adams did testify, several years after the fact, that they were unaware of the compensation arrangement. Their asserted ignorance of the compensation arrangement is not sufficient to excuse them or the entire Board from the knowledge imputed to it.

Under the circumstances of this case, it would be inequitable for the Court to require Garrett to make an accounting of the funds he received under the compensation arrangement, and to turn over such funds in his possession to Adams. For the reasons stated, the Court must conclude that Garrett did not receive what Adams terms "secret profits". Garrett was not in breach of his fiduciary duties as a director of Adams when he accepted, under the compensation arrangement, a "founder's fee" from Brigham and Askew.

The Court must consider also whether Garrett gave consideration in the employment contract executed by the Board of Directors of Adams.

Plaintiff states that the Board believed Garrett's consideration in the employment contract was a willingness to suffer a loss of his consultantcy agreement with Dixie. In plaintiff's view, the Board was intentionally misled by Garrett and, thus, caused to rely upon the distorted and incomplete facts. For these reasons, plaintiff takes the view that Adams received no consideration in return for employment contract with Garrett.

The Court finds plaintiff's assertions to be without merit.

■ Consideration has been defined to be some right, interest, profit or benefit accruing to one party or some forbearance, detriment, loss or responsibility given, suffered or undertaken by another. *North American Royal Coal Co. v. Mountaineer Developers, Inc.*, 239 S.E.2d 673 (W.Va.

1977). It is not essential to the validity of the contract that the pecuniary value of the benefit to the promissor should equal that of the obligation incurred. *Janes v. Felton*, 99 W.Va. 407, 129 S.E. 482 (1925). Thus, little is required in the way of consideration to make a contract valid and enforceable. *Ravencliff Development Co. v. Lafferty*, 103 W.Va. 539, 138 S.E. 104 (1927). Any act done by the promissee at the request of the promissor is a sufficient consideration for a promise made without fraud and with full knowledge of all the circumstances. *Good v. Dyer*, 137 Va. 114, 119 S.E. 277 (1923).

Garrett agreed in the employment contract[3] to perform "such duties as may from time to time be determined by the Board of Directors of Adams" in the capacity of a senior consultant. Plaintiff maintains that Garrett refused to perform any duties requested of him by one Daniel Tessler, manager and later president of Adams. Plaintiff acknowledges, however, that upon the request of the Board, Garrett did perform those duties requested of him under the provisions of the employment contract. The Court is of the opinion that, under the terms of the agreement, Garrett was required to perform duties under the contract only at the direction of the Board and not management.

In a consultantcy provision of an employment contract, consideration is not properly characterized as requiring actual performance of duties under the contract, but rather a willingness among the parties to perform when properly called upon to do so. The District Court in *Wolgin v. Atlas United Financial Corp.*, 397 F.Supp. 1003 (E.D.Pa.1975) reviewed the validity of consideration in the form of a promise to perform consultation services. In *Wolgin*, the court found that the crucial factor which established consideration was that each party "stood ready to perform 'consultation services . . . as [might] be determined by the Board of Directors . . .'" *Id.* at 1014. The defendants in the action

contended that the agreements between the parties lacked consideration and were unenforceable. The *Wolgin* court responded to defendants' contention by stating:

> "The only failure in these cases is on the part of [defendant] to avail itself of the services it could call upon [plaintiff] . . . to perform under the employment agreements. There is ample consideration in plaintiffs' commitments to perform services of an executive nature when called upon by [defendant]."

*Id.*

Garrett further agreed not to "directly or indirectly solicit business with respect to products or services from time to time produced or provided by Adams . . . or services competitive therewith from any individual or enterprise which, during the twelve-month period preceding the termination of the Employment Period [April 5, 1975], was a customer of Dixie. . . ." He also agreed not to solicit business within a radius of 200 miles of an Adams plant which might be in direct or indirect competition with Adams. The duration of these restrictions against Garrett was to be for a period of two years following termination of the employment period.

Covenants not to compete have been held valid under Virginia law. *E. g., Worrie v. Boze*, 191 Va. 916, 62 S.E.2d 876 (1951). In *Faw, Casson & Co. v. Cranston*, 375 A.2d 463, 466 (Del.Ch.1977), the court stated that an agreement not to compete required "mutual assent to the terms of the agreement by all parties and the existence of consideration." Mutual promises between the employer and employee were found to furnish valuable consideration for each party to the contract. *Id.*

By their very nature covenants not to compete are necessarily restrictive of trade. Public policy governs when such restrictions become unconscionable. In the instant matter, the Court finds that Garrett gave valuable consideration by promising not to

---

3. Plaintiff acknowledges that the employment contract was in the form of a pension for Garrett. (Plaintiff's Post-Trial Brief 25.)

compete against Adams as specified in the employment contract. The Court also finds that he gave consideration in his promise not to divulge "any confidential information relative to the business, sales or financial condition of Adams to any individual," firm or corporation without the consent of Adams.

A thorough examination of the record fails to reveal that Garrett either fraudulently induced or intentionally misled the Board as to all the circumstances surrounding the compensation arrangement he had with Brigham and Askew. In addition, the fundamental facts relied upon by plaintiff in raising allegations which would require Garrett to be denied relief owing to a lack of clean hands have been reviewed by the Court and are found to be without merit.

Therefore, the Court is of the opinion that Garrett is entitled to appropriate relief and his claim against Adams will be allowed. An Order will be entered pursuant to the foregoing.