**In re ADAMS LABORATORIES, INC., Debtor.**

**ADAMS LABORATORIES, INC., Plaintiff,**

**v.**

**Howard K. ASKEW and Charles T. Brigham, Defendants.**

**Bankruptcy No. 77–243–A.**

United States Bankruptcy Court, E. D. Virginia, Alexandria Division.

April, 8, 1980.

Michael McGettigan, Alexandria, Va., James D. Maddox, Rome, Ga., for defendants.

Geoffrey Judd Vitt, Alexandria, Va., Caplin & Drysdale, Washington, D.C., for debtor.

## MEMORANDUM OPINION

MARTIN V. B. BOSTETTER, Bankruptcy Judge.

Howard K. Askew and Charles T. Brigham (hereinafter defendants) seek payment of claims allegedly owed to them by Adams Laboratories, Inc., debtor-in-possession (hereinafter Adams), as set forth in defendants' Answer and Counterclaim filed with the Court on June 2, 1978.[1] Adams objects

---

1. Defendants withdrew Count Three of their Counterclaim prior to trial. They alleged therein that Adams had fraudulently induced them to enter into the Stock Purchase Agreement by misrepresenting the value of Adams' stock which they were to receive.

to defendants' Counterclaim and avers several offsets to said Counterclaim.

Defendants were the sole stockholders of a Georgia corporation, Dixie Industries, Inc. (hereinafter Dixie of Georgia). Dixie of Georgia's principal business was the development, production and marketing of energy supplement animal feed products in the southeastern United States. Beginning in 1971, Adams approached Dixie of Georgia in an effort to acquire the latter. Although Adams obtained an option to purchase Dixie of Georgia, the option expired without being acted upon by Adams in 1972.

The Adams Board of Directors (hereinafter Adams Board) expressed renewed interest in acquiring Dixie of Georgia in 1973. Adams directed Donald Pennington, Vice President of Finance and Administration (who also served as Adams' Secretary and Treasurer) to actively negotiate the acquisition of Dixie of Georgia by Adams.

As a result of extensive negotiations with defendants, the parties agreed in principal to a sale of Dixie of Georgia which was embodied in a Stock Purchase Agreement. The Boards of Directors of Adams and Dixie of Georgia subsequently adopted the Stock Purchase Agreement. The agreement was formally entered into by the parties on March 21, 1974, and closed May 1, 1974.

Defendants received in exchange for the outstanding stock of Dixie of Georgia the following valuable consideration: cash in the amount of $280,728.00; 19,258 shares of Adams' common stock; a promissory note in the principal amount of $170,000.00 and a noninterest-bearing promissory note in the principal amount of $38,870.00.

As part of the consideration given by Adams for the purchase of Dixie of Georgia, the former agreed to enter into a ten-year employment agreement with defendants each in the amount of $15,000.00 per year, plus $6,000.00 expenses a year. Defendants were also to receive a commission on sales over 2,000,000 pounds of energy feed supplement products per month to be paid at the rate of $0.05 per hundredweight.

Adams made a payment of the $100,000.00 installment but refused to pay the balance in the sum of $70,000.00 because of offsets it alleges that it is entitled to make. Adams notified defendants by letter dated February 11, 1977, that their services with Adams were to be terminated effective December 17, 1976.

Adams encountered severe financial difficulties which caused it to file a corporate reorganization petition under Chapter XI of the Bankruptcy Act on March 30, 1977. Adams proposed a Plan of Arrangement in February 1978 which became final in August 1978.

Defendants filed suit against Dixie of Georgia and Adams in Cherokee Superior Court, Canton, Georgia, on May 10, 1976, seeking to recover the $70,000.00 due on the promissory note. After their employment with Adams was terminated, defendants sought leave of the Superior Court (which was subsequently granted) to file supplemental pleadings alleging additional counts to their Complaint relating to accrued salaries and to breach of their employment agreement with Adams. This Court later enjoined further proceedings against Adams by defendants in the Cherokee Superior Court.

Adams asserts several grounds on which it is urged that the Court deny defendants' relief as requested in their Answer and Counterclaim, and to make Adams whole in any of the surplus sums of money averred in its offsets against defendants. Adams claims that it is entitled to offsets against purported preacquisition taxes paid by it on sums of money allegedly owed by Dixie of Georgia; that alleged accrued salaries be denied to defendants; that defendants be denied an award of damages for the termination of their employment agreement with Adams; and that defendants be required to pay Adams $50,000.00 in damages to meet

National Pollution Discharge Elimination System (hereinafter NPDES) requirements to add pollution control devices in its Jackson, Mississippi, plant.

The terms of the Stock Purchase Agreement required Adams to make cash payments to defendants in the amount of $170,000.00 payable in two installments. The first installment was paid in the amount of $100,000.00. The final installment of $70,000.00 was not made when it was due in May 1976 and remains due and owing.

Adams notified defendants by letter dated April 9, 1976, that pursuant to the terms of the May 1, 1974, non-negotiable promissory note, it was making certain reductions of consideration.[2] Adams contends that it paid $62,685.59 to the United States Internal Revenue Service which it purports was owed by Dixie of Georgia as additional federal income taxes for the fiscal years 1969, 1970 and 1971. Adams also contends that it paid "$2,224.88 as additional state income taxes to the State of Georgia on behalf of Dixie . . . for its fiscal years 1970 and 1973." Adams asserts, therefore, that it is entitled to an offset of $65,010.47 against the $70,000.00 due defendants in May 1976. The "Schedule of Deficiencies Asserted Against Dixie of Georgia" listed only that an IRS audit was in progress at the time the sale was closed on May 1, 1974.

The burden of proof is on the movant to establish a set-off against contractual obligations incurred by it. In the instant matter, Adams introduced two checks, one dated January 14, 1976, payable to the United States Internal Revenue Service in the amount of $62,685.59, and the other dated September 9, 1975, payable to the State of Georgia in the amount of $2,324.88. Robert Geiger, Comptroller of Adams, testified that the checks were supported by various source documents in the files of Adams. Geiger testified further that as Comptroller he directed the preparation of the checks. He stated that the checks were made in payment of preacquisition taxes which were owed by Dixie of Georgia.

The Court notes that, although Geiger testified as to the existence of source documents which would support his testimony and Adams made payment of what were termed "preacquisition taxes", no such source documents were admitted into evidence. Having searched the entire record, the Court is unable to ascertain when the purported preacquisition taxes were due and owing by Dixie of Georgia and what the breakdown was between principal, interest or late filing penalties (if any). The Court finds no evidence in the record which establishes why payment made by Adams was accomplished more than eighteen months following the closing of the Adams-Dixie of Georgia transaction. Such a delay may have caused additional interest and penalties to accrue for which Adams would have Dixie of Georgia remain liable. The Court is cognizant of the fact that defendants agreed in the Stock Purchase Agreement to hold Adams harmless from "all damages, losses and liabilities" from the Internal Revenue Service audit then in progress;[3] and that they agreed further to establish a reserve for payment of any taxes assessed against Dixie of Georgia.[4]

2. The note states in pertinent part:
 "[T]he principal amount from time to time unpaid and any interest payable thereon under this Note . . . shall be subject to reduction by Dixie of Delaware as herein provided in the event of any breach of any covenant or warranty, or, of any incorrect or erroneous representation, of Dixie of Georgia or payees set forth in said Stock Purchase Agreement, or in any schedule therein provided for . . .".

3. "8.1(h) Sellers jointly and severally agree to hold Adams and Dixie of Delaware [a wholly owned subsidiary of Adams which purchased eighty percent of Dixie of Georgia's stock]

harmless from and against any and all damages, losses and liabilities . . . that result from the deficiencies that are listed in the 'Schedule of Deficiencies Asserted Against Dixie of Georgia' . . .".

4. "1.16 Dixie of Georgia has filed all tax returns required to be filed and has paid, or set up an adequate reserve for the payment . . . of all taxes of Dixie of Georgia, anticipated to be payable in respect to the period subsequent to the last of such periods . . . other than deficiencies disclosed in 'Schedule of Deficiencies Asserted Against Dixie of Georgia' . . .".

■ A thorough examination of the record does not reveal the fundamental nature of the payments made by Adams to the Internal Revenue Service and the State of Georgia. Accordingly, the Court can make no other finding but that Adams has presented insufficient evidence to establish with certainty proof of the assessment of such taxes against Dixie of Georgia and the dates to which the assessments date.

According to the terms of the Stock Purchase Agreement, the defendants agreed to meet certain accounts receivable therein stated within specified periods of time. Adams maintains that it is entitled to offset two specific accounts receivable which defendants did not pay as they were allegedly required to do. The first is a set-off for an alleged account receivable guaranteed for Hill Askew by his brother, Howard Askew, in the sum of $1,801.00. The second is a set-off for an alleged account receivable in the sum of $12,103.30 for equipment notes receivable-Jackson, i. e., the Jackson Plant of Dixie of Georgia.

Geiger further testified that he received what he purported to be a promissory note from Howard Askew, dated February 27, 1976, in which Askew allegedly promised to pay Adams the salary advanced by it to his brother, Hill Askew, in the sum of $1,801.00.[5] Geiger also testified that Hill Askew's obligation to Adams predated the alleged promissory note made by Howard Askew. According to Geiger, no consideration was given by Adams for Howard Askew's promise to make good the obligation owed by Hill Askew.

Howard Askew admitted that he signed a letter in which he agreed that if his brother did not pay Adams he would do so. He also acknowledged that he made no payment on the alleged promissory note.

The Court, after having examined the alleged promissory note, finds that there is nothing on the face of the document to indicate where it was executed. The alleged promissory note is in the form of a letter. The Court observes that Howard Askew, in responding to written interrogatories propounded to him by Adams, stated that his residence is Route 5, Box 68, Canton, Georgia; and that his business address is P.O. Box 739, Canton, Georgia. Askew has resided at this residence address since 1960. In the absence of evidence to the contrary, the Court will construe the alleged promissory note as having been executed in Georgia.

■ A contract, to be valid and legally enforceable, must be supported by consideration. Georgia Code Ann. § 20–301 (1977 Rev.). Any promise made by a person that is not supported by consideration is said to be *nudum pactum ex quo non oritur actio*. While a promise to do an act may be morally enforceable, the law cannot compel the performance of an act without sufficient consideration.

In *Georgia Casualty & Surety Co. v. Hardrick*, 211 Ga. 709, 88 S.E.2d 394 (1955), the Georgia Supreme Court observed that "good considerations" are distinguishable from "valuable considerations". "A good consideration is such as is founded on natural duty and affection or on a strong moral obligation. A valuable consideration is founded on money . . . or having a value in money." *Id.* 88 S.E.2d at 396. A party who has received a naked promise which is subsequently broken is no worse off than he was before. As nothing was given by the promisee for the promise, he has lost nothing by it. *Davis & Co. v. Morgan*, 117 Ga. 504, 43 S.E. 732, 733 (1903).

The Georgia Supreme Court held in *Davis v. Tift*, 70 Ga. 52, 56 (1883) that as defendant's "undertaking was made, and without any new consideration, it was a nude pact, and not binding, although in writing." Inasmuch as Geiger testified that Howard

---

**5.** This Note states:

"For consideration received, I hereby promise to pay the sum of one thousand, eight hundred and one dollars ($1,801.00) to Adams Laboratories, Inc. on or before May 1, 1976. If Hill Askew shall first pay all or any part of such sum, my obligation shall be reduced by that amount."

Askew did not receive any consideration and that his promise to make good Hill Askew's salary advance by Adams was made after the salary advance was given to Hill Askew, the Court finds that the promissory note is *nudum pactum* and not legally binding under Georgia law.

■ We will turn to the issue concerning a guarantee by both defendants for the payment of specified accounts receivable within one year following the closing of the Stock Purchase Agreement between Adams and Dixie of Georgia. Appended to the Stock Purchase Agreement is a "Schedule of Accounts Receivable Within One Year", which includes "Equipment Accounts Receivable from Jackson, Mississippi operation $31,739.90."

In this connection, Adams notified defendants by a letter dated April 9, 1976, that the final $70,000.00 installment would not be met allegedly because $12,103.30 had yet to be paid within the time period specified in the Stock Purchase Agreement.

Adams sought to have entered into evidence an affidavit of its accountant with schedules appended thereto. Only Schedule "C", the promissory note of Howard Askew, was admitted. The Court did, however, allow the admission of source documents as an open exhibit which noted various equipment notes receivable. Geiger testified that the supporting documents were but one of the sources which provided him with the total amounts due and owing Adams on the equipment notes receivable. Geiger did not identify these other sources.

The Court, having thoroughly examined the source documents, admitted as an open exhibit, concludes that they fail to state with sufficient specificity the equipment notes receivable due and owing by defendants within the time period stated in the Stock Purchase Agreement. The Court is unable to find a correlation between the sums of money which Geiger testified were based upon a summary not admitted into evidence and the source documents produced by Adams. Furthermore, two of the individuals appearing on the summary identified by Geiger, Donald Kitchen and David

Saucier, did not appear in any of the three source documents.

Appended to the April 1974 notes receivable source document is an adding machine list of various figures which is dated April 30, 1974. At the top of this list is an undated notation which lists uncollected accounts receivable in the sum of $1,883.06. Total equipment notes receivable were placed at $7,536.55, from which the sum of $3,954.37 was termed "written off". The sum of $1,699.46 was listed as collected. The Court is unable to ascertain from these source documents which of the equipment notes receivable were part of the accounts receivable in existence on March 21, 1974.

The Court next considers whether defendants are entitled to accrued salaries as alleged in Claim Two of their Claim against Adams. At trial, Adams moved to have this claim dismissed on grounds that it was barred by the applicable Georgia statute of limitations. The Court reserved ruling on this motion.

Defendants contend that Adams is indebted to them in the sum of $76,000.00 in accrued salaries with $38,000.00 of this amount due to each of them. Defendants seek payment from Adams inasmuch as Dixie of Georgia (which allegedly owed the accrued salaries) merged into Dixie of Delaware (a subsidiary of Adams) on November 5, 1976. Dixie of Delaware merged into Adams on November 29, 1976. Defendants also allege that Adams has assumed and is responsible for all debts and contractual obligations of Dixie of Georgia and Dixie of Delaware.

Charles T. Brigham testified that at the time Dixie of Georgia entered into the Stock Purchase Agreement with Adams, Dixie of Georgia owed defendants a total of $76,000.00 for accrued salaries.

The record indicates that the Adams Board authorized one Jack Prizzi, a director of Adams, to make a thorough investigation of Dixie of Georgia's financial condition and to evaluate the information gathered in terms of a possible acquisition of Dixie of Georgia by Adams. The results of his in-

vestigation were reduced to a written memorandum [hereinafter Prizzi Report]. The Prizzi Report was formally presented at a meeting of Adams' Board on December 13, 1973.

Brigham identified a balance sheet appended to the Prizzi Report dated July 31, 1973, which indicated that Dixie owed defendants accrued salaries in the sum of $91,150.00. Also appended to the Prizzi Report is a combined Balance Sheet for Adams and Dixie of Georgia, wherein under the heading "Liabilities and Equity", there appears the subheading "Long Term Debt Note Due Officer & Employees [of Dixie of Georgia] [$]91,150." The Prizzi Report sets forth a proposal for consideration to be furnished by Adams to acquire Dixie of Georgia. Included in this proposal under the heading "Liabilities of Dixie to be paid to owners [Brigham and Askew] [are] Accrued Salaries $91,000.00".

Brigham testified that between July 31, 1973, and April 30, 1974, the amount of salaries accrued and owing had been reduced to $76,000.00. The record indicates that salaries initially accrued on Dixie of Georgia's books on July 31, 1969, and July 31, 1970, in the sums of $80,000.00 for each year. Brigham testified that salaries were accrued by Dixie of Georgia at various times subsequent to these initial salary accruals.

Pennington testified that the Prizzi Report contained the balance sheets of Dixie of Georgia as of July 31, 1973, with accrued salaries in the sum of $91,150.00. He also testified that at the time defendants entered into the Stock Purchase Agreement with Adams he was aware that there existed an accrued salaries item on the books of Dixie of Georgia. Pennington testified also that defendants, on numerous occasions following the sale of Dixie of Georgia to Adams, made requests that the salaries accrued and owing to them be paid by Adams. Explaining Adams' position on this issue, Pennington stated:

"Well, I told them [Brigham and Askew] we [Adams] had the same problem paying them that they had, that the reason they had it on their books as accrued, we were a little short of cash. When we had the cash to do it, we would pay them, but until then, we would acknowledge the debt; that we just did not have the money to pay them. We were successful in delaying payment of (sic) that time the sale of the stock of Brigham and Askew was made to Adams Laboratories."

(Pennington Testimony T–13.)

Accordingly, the Court finds that defendants have established by competent evidence that Dixie of Georgia had on its books salaries accrued and owing to defendants in the sum of $76,000.00. We must then determine whether defendants' claim for accrued salaries is barred by Georgia's statute of limitations.

█ The claim raised by defendants is one based upon salaries accrued and owing by Dixie of Georgia, a Georgia corporation, to its sole stockholders, whose duties and obligations were performed for the benefit of the corporation in Georgia. Accordingly, Georgia law will be applied for the resolution of this issue.[6]

Under Georgia law, there are two statutes which make provision for when the statute of limitations begins to run on an "account" action. The first, Georgia Code Ann. § 3–706 (1975 Rev.), provides that with respect to an "open account" all claims must be filed within four years of the date the cause of action accrued. The second, Georgia Code Ann. § 3–707 (1975 Rev.),

---

**6.** Virginia law governs this procedural issue. The general rule is that the forum applies its own statute of limitations. An exception to this rule exists when application of the Virginia borrowing statute is deemed appropriate. *See* Va.Code § 8–247. Said statute "does not depend on whether the party to be charged is a resident of Virginia, but on whether the party is a resident of the foreign state." 4A Michie's Jur. Conflict of Laws, Domicile and Residence, § 39 (1979 Cum.Supp.). For a recent decision upholding the application of the former Virginia borrowing statute, *see Fine & Salzberg, Inc. v. Western Auto Supply Co.*, 549 F.2d 923 (4th Cir. 1976). The record in the present case demonstrates that defendants performed their duties principally in Georgia, were employed by a Georgia corporation, and resided in Georgia.

provides that with respect to a "mutual account" all claims must be filed within four years of the date from the last entry of the account.

The Court finds defendants' assertion that accrued salaries cannot be considered in the same fashion as an open account to be without merit.

An "open account" is an account the balance of which has not been determined. Such an account results where the parties intend that the various transactions between them shall not be considered independent of one another, but rather as a connected series of transactions. The amount remains open and is subject to a shifting balance of related entries of debts and credits.

A "mutual account" as established under Georgia law " 'is one based on a course of dealing wherein each party has given credit to the other, on the faith of indebtedness to him.' " *Bank of Blakely v. Buchannon*, 13 Ga.App. 793, 80 S.E. 42, 43 (1913). In *Williams v. Leide Associates*, 133 Ga.App. 454, 211 S.E.2d 407, 408 (1974), the court held:

> "In order to make a mutual account, there must be indebtedness on both sides; and in the absence of evidence such mutual dealings and indebtedness, mere entries of credits of partial payments made on a debt evidenced by open account will not make it such a mutual account as will prevent the statute of limitations from beginning to run until the date of the last item thereof." (Citations omitted.)

By finding that the accrued salaries constitute an open account between defendants and Dixie of Georgia, Georgia Code Ann. § 3–706 (1975 Rev.) is applicable herein and bars recovery of all claims based upon amounts accrued from the date upon which the first indebtedness occurred. In the instant matter, the four-year statute of limitation began to run on salaries accrued on July 31, 1969, and July 31, 1970, respectively.

Georgia law is quite specific about the manner in which a promise may be sufficient to revive a claim for accrued salaries once the applicable statute of limitation has run. Georgia Code Ann. § 3–901 (1975 Rev.) requires that the promisor reduce the promise to a writing. Similarly, Georgia Code Ann. § 20–401 (1977 Rev.) (the Georgia statute of frauds) requires that the promisor must reduce to writing his "promise to revive a debt barred by a statute of limitation" and signed by promisor. The Court notes that Brigham testified that no written promise to pay accrued salaries was made by Adams to defendants following the sale of Dixie of Georgia to Adams.

■ Ordinarily, the Court would be constrained to hold that defendants' claim should be disallowed as being barred by the four-year statute of limitation applicable in Georgia to open accounts. However, the Court recognizes that Section 2a of the Bankruptcy Act provides that courts of bankruptcy are invested "with such jurisdiction at law and in equity as will enable them to exercise original jurisdiction in proceedings under this [Act] . . .". For many purposes, therefore, "courts of bankruptcy are essentially courts of equity and their proceedings inherently proceedings in equity." *Pepper v. Litton*, 308 U.S. 295, 304, 60 S.Ct. 238, 244, 84 L.Ed. 281 (1939). A court of bankruptcy may, in exercise of discretion, either make a grant of relief or deny the same upon condition dictated by equitable principles. *National Bank & Trust Co. v. Allied Supply Co.*, 386 F.2d 225 (4th Cir. 1967).

■ The Supreme Court of Minnesota in *Suske v. Straka*, 229 Minn. 409, 39 N.W.2d 745, 750 (1949) observed that "[w]hile estoppel is sometimes said to be a mere rule of evidence, it is in reality one of substantive law, for the reason that it absolutely precludes a party from asserting what otherwise would be his right." Estoppels are a part of the substantive law of contracts. It is clear that a federal court must follow the decisions of the courts of the state touching their construction and operation. *South Penn Oil Co. v. Calf. Creek Oil Co.*, 140 F. 507, 515 (W.D.W.Va.1905). Georgia law establishes the applicable standards for determining whether equitable estoppel is an

appropriate defense to deny Adams the benefit of the statute of limitations.

 The general rule in Georgia is that estoppel, to be relied upon, must be pleaded. *Martin v. Yonce*, 163 Ga. 694, 137 S.E. 17, 19 (1927). A well-recognized exception to this rule exists "where the plaintiff relies upon estoppel in order to defeat a defense raised by the defendant in his answer." *Brown v. Globe & Rutgers Fire Ins. Co.*, 161 Ga. 849, 133 S.E. 260, 262 (1926). In *Broderick v. Reid*, 164 Ga. 474, 139 S.E. 18, 22 (1927), the court held that if the facts and elements of an estoppel are set out, it is not necessary that the word "estoppel" be used.

The Court finds that the defendants' pleadings filed with the Court sufficiently establish the elements by which the Court may determine whether the principles of equitable estoppel apply in the instant matter.

It has been stated that the principle of equitable estoppel is one of long standing under "Georgia law and arises where a party has so acted that he has by his conduct either gained some advantage for himself or caused some disadvantage to another by reason of which it would be contrary to equity and good conscience to permit him to allege and prove the truth." *Levy v. Empire Insurance Co.*, 379 F.2d 860, 862 (5th Cir. 1967). *See Goodwyn v. Goodwyn*, 20 Ga. 600 (1856).

The Court takes cognizance of the admonition followed in Georgia that "estoppels are not favored by our law," *Parker v. Crosby*, 150 Ga. 1, 102 S.E. 446, 448 (1920), and should only be maintained in clear cases. *Choat v. Rome Industries, Inc.*, 462 F.Supp. 728, 730 (N.D.Ga.1978). *See* Georgia Code Ann. § 38–114 (1974 Rev.). Georgia courts have held litigants strictly to the terms of the statute of limitation, "and have made few judicial exceptions to its operation." *Bank of Jonesboro v. Carnes*, 187 Ga. 795, 2 S.E.2d 495, 496 (1939). Statutes of limitation rest "on principles of a sound public policy," and are "not to be evaded except by the methods provided therein". *Id.*, 2 S.E.2d at 497.

The Supreme Court of Georgia in *Cobb County R. E. Mem. Corp. v. Board of Lights & Water Works of Marietta*, 211 Ga. 535, 87 S.E.2d 80, 83 (1955), delineated five conditions which a party seeking to apply the doctrine of equitable estoppel must meet:

"[F]irst, a false representation or concealment of facts; second, it must be within the knowledge of the party making the one or concealing the other; third, the person affected thereby must be ignorant of the truth; fourth, the person seeking to influence the conduct of the other must act intentionally for that purpose; and fifth, persons complaining shall have been induced to act by reason of such conduct of the other."

In *Rieves v. Smith*, 184 Ga. 657, 192 S.E. 372, 377 (1937), the Georgia Supreme Court expressed the view that equitable estoppel or estoppel in pais applies "if a representation [is] made to another who deals upon the faith of it, the maker must make his representation good if he knew or was bound to know that it was false, and thereby receives a benefit or causes detriment to the other."

 The Georgia Supreme Court in *Bank of Jonesboro v. Carnes*, 2 S.E.2d at 497, stated that conditions which amount to estoppel need not be granted only in fraud of the type dealt with in Georgia Code Ann. § 3–807. However, some comparable substitute such as "a course of conduct that would mislead or deceive the holder of the right of action" must be evidenced. *Id.*, 2 S.E.2d at 498. Specifically, there must be "some actual representation or inducement clearly intended to cause the withholding of suit, or a change of position to the detriment of the person in whom the right of action stood." *Id.*

To establish grounds for invoking the doctrine of equitable estoppel, reliance by the party pleading it must be more than merely detrimental, it must be reasonable. *Choat v. Rome Industries, Inc.*, 462 F.Supp. at 732.

Defendants contend that Pennington was Adams' agent with authority from Adams' Board to negotiate the acquisition of Dixie

of Georgia for Adams. Pennington held the positions of Vice President for Finance, Secretary and Treasurer of Adams until his employment with Adams was terminated on December 5, 1975. He testified that on numerous occasions he informed defendants that Adams would pay the accrued salaries due and owing to them by Dixie of Georgia. According to Pennington, Adams would pay defendants their accrued salaries when Adams "had the cash to do it . . . . but until then, [Adams] would acknowledge the debt."

Adams contends that Pennington's testimony should be discounted by the Court on several grounds. First, Pennington only had general conversations with defendants wherein he indicated that Adams would pay the accrued salaries when it had sufficient cash to do so. Second, no specific date for payment of the accrued salaries was ever given by Pennington. Third, while Pennington was a member of Adams' management, he was not a director.

Proof of agency must be made by the movant before a party "can be held bound by acts of another who assumes to represent him." *Commissioners of Roads and Revenues of Decatur County v. Curry,* 154 Ga. 378, 114 S.E. 341, 344 (1922). It has been stated that an estoppel will arise where "'special circumstances' exist which lead a third party reasonably to believe authority was present and, further, where the agent was acting within the scope of his authority." *Griggs v. Dodson,* 223 Ga. 164, 154 S.E.2d 252, 256 (1967). (Citations omitted.) A principal will be held liable for his agent's acts when "he knowingly permits the agent to assume, or holds the agent out" as having the appearance of authority. *Folsom v. Miller,* 102 Ga.App. 232, 116 S.E.2d 1, 3 (1960).

■ The record indicates that Pennington made representations during the course of negotiations with defendants to include accrued salaries as part of the consideration to be paid to defendants upon the acquisition of Dixie of Georgia by Adams. Reference has already been made to the investigation which was conducted by Jack Prizzi, a di-

rector of Adams. With Pennington's assistance, he authored an information memorandum on the proposed acquisition of Adams. Appended to this memorandum were several exhibits which made reference to the salaries accrued and owing defendants by Dixie of Georgia. One of these exhibits set out a proposal for consideration to be furnished by Adams to defendants which included a specific reference to the accrued salaries due and owing by Dixie of Georgia to defendants.

■ The Prizzi Report was formally presented to Adams Board in December 1973. Clearly, Prizzi, the author of this memorandum, must be held to be knowledgeable of its contents. In *Segars v. Cornwell,* 128 Ga.App. 245, 196 S.E.2d 341, 345 (1973), the court observed that "[w]hile the legal opinion incorporated in the minutes [of the board meeting] did not of itself create an estoppel . . . it constituted notice to the management corporation . . . . ". The Adams' Board, having formally received the memorandum at a board meeting, must also be held knowledgeable of its contents.

This Court, in *Adams Laboratories, Inc. v. Garrett,* 3 B.R. 495 No. 77–243–A (Bkrtcy.E.D.Va. April 7, 1980) expressed the view that a "corporation is affected with constructive knowledge 'of all material facts of which an officer acquires while acting in the course of his employment and within the scope of his authority.' [*Duplex Envelope Co. v. Denominational Envelope Co.,* 80 F.2d 179, 182 (4th Cir. 1935)]." The record in the instant matter substantiates the findings made by this Court in *Adams Laboratories, Inc. v. Garrett, supra,* wherein it was stated:

"[I]t has already been established that Pennington was Secretary and Treasurer of Adams during the course of his employment with Adams. Acting merely as Secretary and Treasurer did not give Pennington the authority, by virtue of these offices alone, to speak for or bind Adams to an agreement with Dixie [of Georgia]. The record does reflect, however, that he was authorized by the Board

[of Adams] to conduct negotiations with Dixie [of Georgia]."

The Court finds that Pennington represented Adams throughout much of the course of the Dixie of Georgia-Adams negotiations. The Court also finds that specific references to accrued salaries due defendants and owed by Dixie of Georgia in the Prizzi Report effectively gave notice to Adams' Board of the existence of the accrued salaries. At least as of the time of the compilation of the Prizzi Report, defendants anticipated that payment of the accrued salaries would be furnished to them as part of the consideration for Adams' acquisition of Dixie of Georgia. The Court finds further that Pennington's representations to defendants to the effect that Adams would acknowledge Dixie of Georgia's debt of accrued salaries to them will be imputed to Adams' Board. The Court is of the opinion that the principle of equitable estoppel applies to the circumstances surrounding this matter, particularly in light of defendants' numerous requests for payment of accrued salaries by Adams, and due to the fact that they relied to their detriment on the representations made by Pennington whom they reasonably believed to be Adams' agent with authority to speak for Adams.

Defendants entered into an employment agreement with Dixie of Georgia and Adams on May 1, 1974. The employment agreement was part of the consideration furnished by Adams for the acquisition of Dixie of Georgia. This agreement, which was to be effective for ten years, provided that defendants were to receive annual salaries of $15,000.00 each; an annual expense allowance of $6,000.00 each; and each were entitled to a sales commission on Dixie of Georgia's or Adams' sales of energy supplement produces "at a rate of $0.05 per hundredweight of products sold by employees during each month in excess of 2,000,000 pounds."

Adams' management recommended to the Board of Directors of Adams at a meeting of the Board held on December 17, 1976, that the employment contracts of defendants be immediately terminated, unless the President (Tessler) was unable to successfully renegotiate the employment agreement. Defendants' employment with Adams was formally terminated on April 6, 1977.

An examination of the termination section of the employment agreement includes a clause which may be described as a "satisfaction" provision. Section 8 clause (c) provides:

"The employment period of either Employee may be terminated by Dixie of Georgia by giving written notice thereof to the Employee if: . . .

"(c) A majority of the entire Board of Directors of Dixie of Georgia shall have determined that the Employee was . . . not adequately performing his duties under this Agreement."

It is the general rule that an employer may agree to employ another as long as the employer remains satisfied with the performance of the employee. This gives the employer the right to terminate the employment agreement whenever he, in the exercise of honest judgment, is dissatisfied with the employee's performance. Such a provision in a contract will be given legal effect, and recovery by an employee terminated under a "satisfaction" clause may be precluded when this clause is raised by the employer. *Commercial Mortgage & Finance Corp. v. Greenwich Savings Bank*, 112 Ga.App. 388, 145 S.E.2d 249, 251 (1965).

Although the employer remains the sole judge as to whether the employee's performance is satisfactory, a breach of the contract will be evidenced "where it appears that the employee's services were not unsatisfactory to the employer, and that the employer, when discharging the employee upon the ground that the latter's services were unsatisfactory, falsely, fraudulently, and in bad faith gave this as a reason for the employee's discharge." *Fried v. Portis Bros. Hat Co.*, 41 Ga.App. 30, 152 S.E. 151, 152 (1930).

The burden of proof is on the employee to establish that the employer's claimed dissatisfaction is not in good faith. The employee need only "allege that the defendant's serv-

ices were not in fact unsatisfactory to the employer, and that the employer's assignment as a reason for the employee's discharge that his services were unsatisfactory was false and made fraudulent and in bad faith." The employee need not "allege specifically upon what ground the discharge was actually made." *Id.*

■ Where an employee successfully establishes that he was wrongfully discharged prior to the expiration of his term of employment, and brings suit before the expiration of the term for breach of contract, "the employee's measure of damages is the salary or advancements which he was entitled to receive under the terms of the contract for the remainder of the term subject to reduction by proof at the trial." *Id.*

■ Adams contends that it rightfully discharged defendants under the terms of the termination clause of the employment agreement. Adams alleges several grounds in support of its contention. Adams offered into evidence a letter addressed to Brigham by Charles Garrett, Jr., a director of Adams, dated April 23, 1975, wherein the latter expressed concern "regarding the poor effect and performance with respect to the business success in [the Dixie of Georgia] sales area." [7]

Daniel Tessler, President of Adams, testified that there existed a fundamental difference in sales philosophy between defendants and management. He also testified that sales were hurt in Dixie of Georgia's operational territory, particularly in Mississippi, due to Askew's periodic unavailability (he was a resident of Georgia). According to Tessler, customers and potential customers were unable to rely upon the availability of "sales personnel in the field and know who to call in order to secure price quotes, [and] estimates of available supply."

Defendants claim that Adams did not act in good faith in terminating their employment with the latter. They allege that their discharge was due to a decision by Adams' newly-installed management to substantially reduce payroll expenditures and other operational expenses due principally to Adams' increasingly poor financial condition.

Brigham testified that once he and Askew were relieved of managerial responsibility following the sale of Dixie of Georgia to Adams—although they remained as officers—they were able to put in twice as much time as salesmen for Dixie of Georgia. Brigham also testified that from January 1975 until January 1977, he and Askew made total sales well in excess of the base amount of 2,000,000 pounds of energy supplement products upon which sales commissions were to be based. The record amply supports Brigham's testimony on this point.

Defendants claim that Adams was more concerned about reducing operational expenditures than in terminating employees because of allegedly unsatisfactory performance. In support of their claim, defendants assert that the action taken by Adams' Board at the December 1976 meeting did not *per se* require Tessler to terminate their employment with Adams. Rather, defendants contend that the minutes of that meeting provided that "[t]he employment contracts of Messrs. Brigham and Askew are terminated, effective immediately, except that the President is authorized to attempt to negotiate and execute a modification of the contract which he may substitute for outright termination."

Brigham testified that he and Askew met with Tessler in Adams' offices in Alexandria, Virginia, in December 1976. Tessler requested that defendants accept an ap-

---

7. A report by Adams issued to stockholders, dated July 18, 1975 (three months after the April 23, 1975, letter was sent by Garrett) stated:

"Dixie Industries, Inc., acquired in May 1974 has shown impressive growth and has been responsible for more than 4 million dollars or 28% of total sales volume for the first nine months of this fiscal year. This addition has been timely in view of the fact that the cattle feed lot business, which previously contributed 25% to the company's agricultural sales volume, is currently off by more than 90% . . . .. [I]t is projected that profits in the agricultural division, including Dixie Industries, will off-set these expenses . . . .".

proximately fifty percent reduction in their salaries. Tessler's rationale for this request, according to Brigham, was a desire on management's part to cut expenses. Brigham also testified that Tessler made no mention of any dissatisfaction on Adams' part with his and Askew's performance.

The record indicates that Adams was experiencing financial difficulties following its acquisition of Dixie of Georgia. Economic downturns in the national economy, the availability of inexpensive corn as a feed supplement, harsh weather, and a serious restriction of working capital were principally responsible for Adams poor financial condition between 1974 and 1977. In an effort to reverse this situation, members of the Adams' Board and senior management were removed from their positions and replaced by a new management team. In December 1975, Charles Garrett, Jr., and Donald Pennington were dismissed. At this time, Charles Garrett, Sr., and Charles Garrett, Jr., were not re-elected to the Board. In January 1976, Roger Garrett was replaced by Daniel Tessler as President.

Adams' management under Tessler in 1976 began earnestly to liquidate those divisions of Adams which had been placing a severe drain on Adams' resources. In January 1977, Adams found itself in default of a sizeable bank loan. A memorandum, dated November 12, 1976, issued by a director of Adams, Patricof, stated that "[m]anagement [was] also examining the outlook for the company if it [was] forced to seek relief under Chapter 11 [sic] [of the Bankruptcy Act]." Another memorandum issued by Patricof, dated January 14, 1977, stated:

> "Losses in the past several months, in spite of the dramatic reduction in overhead, have approached $¼ million . . . it is unlikely that profitable operations will be achieved in the near future.
>
> "As a result, the company is taking steps to prepare for an orderly liquidation and if this is not possible, there will be no other choice but to declare Chapter XI

from which there is little hope the business can be resurrected."

Patricof issued another memorandum, dated April 6, 1977, which stated that "Adams had filed a petition for bankruptcy under Chapter XI of the Bankruptcy Act." The memorandum also stated that "all the other high-priced executives have also been terminated."

The Court has carefully examined the record and is fully aware that only under exceptional circumstances should an employer, having entered into a satisfaction contract with his employees, be denied the right to terminate their employment when he alleges dissatisfaction with their performance. The Court, however, is of the opinion that Adams' serious financial problems, when coupled with the amply demonstrated desire of Adams' Board and management to drastically reduce operational expenditures, caused Adams to improperly terminate defendants' employment agreement. Accordingly, defendants are entitled to an award of damages for Adams' breach of the employment agreement.

The Court finds that defendants are each entitled to $111,375.00 in salaries due to them for the balance of the contract period. The Court finds further that the defendants are jointly entitled to sales commissions in the amount of $1,493.75.[8] However, as the amount of sales commissions claimed by defendants beyond the termination of their employment is clearly speculative, recovery of any such amounts must be denied. Defendants' claim for a sales expense allowance is also denied, since the purpose of such an allowance was only for reimbursement of expenses incurred prior to the termination of their employment with Adams.

The Court next considers whether Adams has been damaged by defendants' failure to obtain an allegedly required NPDES permit for Dixie of Georgia's Jackson, Mississippi, plant.

---

8. Adams acknowledges that defendants are entitled to this amount. Plaintiff's Post-trial Brief at 1, n.2.

Adams contends that under the Stock Purchase Agreement, defendants were required to have all necessary federal and state licenses and permits for the operation of Dixie of Georgia's production plants.[9] Adams is seeking $50,000.00 in damages against defendants for capital costs necessary to purchase pollution abatement equipment. Adams takes the position that it is due said amount because it can neither operate the Jackson plant without a NPDES permit nor can it sell the Jackson plant to a prospective buyer without such a permit.

In support of its position, Adams places particular reliance on a letter addressed to Charles Garrett, Jr. (a director of Adams) from one, John W. Harper, Chief of the Law Enforcement Division, Mississippi Air and Water Pollution Control Commission (hereinafter Mississippi Commission), dated May 20, 1975. Harper expressed concern therein that "[o]n May 16, 1975, January 20, 1975, October 16, 1972, and in December of 1970, spillages occurred at the facility [Jackson plant] which left the company area and entered waters of the State." Harper also noted due to a wastewater discharge at the plant site an NPDES permit would be required. Adams contends that pollution complaints made known to Askew prior to May 1, 1974, and evidence in the Mississippi Commission establishes that the Jackson plant needed an NPDES permit.

The Court is unable to find in the record any formal notification by the United States Environmental Protection Agency or the Mississippi Commission made the defendants, while sole stockholders of Dixie of Georgia, that they were to secure an NPDES permit for the Jackson plant. Askew received a letter dated October 1, 1971, from one David Hagerman (Senior Engineer, Industrial Waste Section) wherein he stated "[t]he [Mississippi] Commission has directed me to notify you that your company is now in compliance with the Commission Order of August 18, 1970."

The Court takes cognizance of a letter addressed to one, Charles Chisom (a member of the Mississippi Commission) from Eston Melton, Jr., Vice President of Adams, dated March 8, 1977. It states in pertinent part:

"In regards to the Pearl [Jackson] plant, I advised you that we were in the process of stopping operations there. The decision to cease operations at Pearl was prompted by the economic performance of the plant and not by environmental considerations. It would be our intent to reactivate operations there if and when economic conditions suggested it appropriate to do so."

The Court finds that Adams has not established by competent evidence that defendants were required to acquire an NPDES permit prior to May 1, 1974. The Court further finds that the weight of the evidence supports the view that defendants were in compliance with applicable state environmental statutes, and that no action was taken by the United States Environmental Protection Agency to require that they acquire an NPDES permit. The Court finds also that Adams closed the Jackson facility in March 1977 because of economic and not environmental considerations. Therefore, the Court concludes that Adams' claim for damages in the amount of $50,-000.00 must be denied.

The claims herein granted to defendants are to be applied under the thirty-five percent Plan of Arrangement, and will be allowed upon the entry of an Order reflecting the appropriate amount of recovery.

9. Adams refers specifically to Articles 1.6(*o*), 1.11 and 8.1(c)4 of said Stock Purchase Agreement.